**INTERNATIONAL & G. N. R. CO. v.
EDMUNDSON. (No. 135-3038.)**

(Commission of Appeals of Texas, Section A.
May 26, 1920.)

**1. Libel and slander ⬤⟿45(1)—Communication
to one having corresponding interest is "privileged occasion."**

When a communication is fairly made by
one in the discharge of a public or private duty,
legal, moral, or social, of perfect or imperfect
obligation, or in the conduct of his own affairs,
to one who has a corresponding interest to receive such communication, the occasion is privileged.

[Ed. Note.—For other definitions, see Words
and Phrases, First and Second Series, Privileged Occasion.]

**2. Libel and slander ⬤⟿101(4)—Burden of
proof as to malice in case of privilege stated.**

In an action for libel, malice may be inferred from the falsity of the charge or imputation, unless the occasion is privileged, but, if
the occasion be privileged, a proper and sufficient motive is shown repelling the inference of
malice and giving rise, in view thereof, to the
presumption that the communication was made
in good faith, whereupon it devolves upon plaintiff to establish malice in fact.

**3. Libel and slander ⬤⟿51(1)—"Malice" avoiding privilege defined.**

In libel the "malice" which avoids a privilege is actual or express, existing as a fact
at the time of the communication, and which
has inspired or colored it, and such malice
exists where one casts an imputation which he
does not believe to be true, and where the communication is actuated by some sinister or corrupt motive, or motives of personal spite or
ill will, or where the communication is made
with such gross indifference to the rights of
others as will amount to a willful or wanton act.

[Ed. Note.—For other definitions, see Words
and Phrases, First and Second Series, Malice.]

**4. Libel and slander ⬤⟿112(2)—Actual or express malice may be proved by circumstantial evidence.**

In libel or slander actual or express malice
need not be proven by direct or extrinsic evidence, but it may be inferred from the relation
of the parties, the circumstances attending the
publication, the terms of the publication itself, and from the words or acts of defendant
before, at, or after the time of the communication, but it must be evidence from which the
jury may infer malice existing at the time of
publication and actuating it.

**5. Libel and slander ⬤⟿50—Privilege not lost
because belief of truth not based on reasonable grounds.**

In libel or slander, if one makes a statement believing it to be true, he will not lose
the protection arising from the privileged occasion merely because he had ·no reasonable
ground for his belief.

**6. Libel and slander ⬤⟿44(3)—Letter from defendant's superintendent causing plaintiff's
discharge for violation of rules held privileged.**

In a libel suit brought against a railroad
company by a discharged baggageman in the
joint service of an express company and defendant, based upon a letter to the express
company by defendant's superintendent requesting his discharge because he had carried a
passenger in the baggage car contrary to regulation, the letter was privileged; the superintendent in good faith believing the information
upon which it was based to be true.

**7. Libel and slander ⬤⟿101(4)—Evidence held
insufficient to justify legal inference of malice.**

In a libel suit against a railroad company
brought by a discharged employé based on a
letter from defendant's superintendent to plaintiff's employer, charging violation of rules, the
failure of defendant's superintendent to answer plaintiff's letters of inquiry and his refusal to investigate the charges in the letter
held not inconsistent with the superintendent's
good faith so as to justify a legal inference of
malice.

**8. Constitutional law ⬤⟿105—Privilege cannot be taken away by retroactive legislation.**

Where the defense of privilege in a libel
suit is a vested ground of defense, it cannot be
taken away by retroactive legislation, in view
of Const. art. 1, § 16.

**9. Constitutional law ⬤⟿105—Privilege as
vested ground of defense held protected by
statute.**

Section 5 (Vernon's Sayles' Ann. Civ. St.
1914, p. 4863) of the act adopting and establishing the Revised Civil Statutes providing
that the repeal of any statute or any portion
thereof shall not affect any act done, vested, or
accrued, held to protect privilege in a libel
suit as a vested ground of defense.

Error to Court of Civil Appeals of Fourth
Supreme Judicial District.

Action by O. O. Edmundson against the
International & Great Northern Railway
Company. Judgment for plaintiff was affirmed on appeal (185 S. W. 402), and the defendant brings error. Reversed and rendered.

Wilson, Dabney & King, of Houston, and
F. C. Davis and Marshall Eskridge, both of
San Antonio, for plaintiff in error.

Ernest Fellbaum, Claude J. Carter, Perry J.
Lewis, Champe G. Carter, Randolph L. Carter, and H. C. Carter, all of San Antonio, for
defendant in error.

SONFIELD, P. J. Action for libel by O.
O. Edmundson, plaintiff against the International & Great Northern Railway Company,
defendant.

The Pacific Express Company operated in
the cars and over the railway line of defendant railway company. Plaintiff was employ-

ed by the express company as express messenger, and handled the baggage of the railway company. He was required to make report after each trip. As express messenger, he reported to the express company, and, as baggagemaster, he reported the baggage handled on the trip directly to the chief baggagemaster of defendant. While employed and paid by the express company, he performed a joint service for the express and railway companies; the railway company repaying to the express company each month the proportion of his salary representing the value of his services rendered the railway company. The contract between the two companies provided that the employés of the express company must abide by the rules of the railway company, and were not to be retained in the service if they violated such rules, or were otherwise unsatisfactory to the railway company. The railway company was to report to the express company any breach of the rules or any conduct not conducive to good discipline or prejudicial to the service.

H. Martin was the superintendent of the defendant railway company, and as such superintendent he received the following report from the George A. Fields Detective Agency of St. Louis, Mo.:

"Operative's Initials. * * * A. T. P.: At 3:30 p. m. Tuesday, July 26, 1910, I left Valley Junction for Palestine on train No. 6, trip No. 34, arriving at 7:10 a. m. Wednesday, July 26, 1910. The train consisted of one engine, one combination mail and baggage; one baggage car, No. 30, one chair car, and two Pullman cars, leaving Valley Junction No. 1. I met Jim Beard and I asked him what was doing. He said, 'How much money have you?' I pulled out a $2 bill. He said 'Get over on the other side of this baggage car [No. 30], and when we get to Palestine I will come and let you know when to get out.' The same morning the baggageman saw me, and he come to collect. He said, 'Who put you in here?' I said, 'I have already paid Jim Beard,' and he went out. At Palestine Jim Beard came and told me to stay on until the train stop at the station, and get off and walk along the side."

Acting upon this report, Martin wrote the following letter, which is the basis of this action:

"International & Great Northern Railroad Company.

"H. Martin, Superintendent.

"Palestine, Texas, Oct. 22, 1910.

"Mr. T. N. Edgell, Superintendent Pacific Express Co., Dallas, Texas—Dear Sir: Will you please relieve joint express and baggageman W. V. Buttrell from service on this line on account of carrying passenger in baggage car on train 9 July 21st, and relieve O. O. Edmundson (meaning plaintiff) from joint service on account of carrying passenger in baggage car on train No. 6 arriving Palestine July 26th.

"Please favor me with your reply.

"Yours truly,      [Signed] H. Martin."

Edgell, upon receipt of the letter, placed a copy thereof in his letter file, and transmitted the original to Beatty, route agent of the express company, upon whom devolved the duty of employing and discharging; and plaintiff was immediately dismissed from the service. Subsequently, at the request of plaintiff, Edgell sent him a copy of Martin's letter.

Plaintiff alleged that the carrying of a passenger in a baggage car was a serious breach of discipline and a serious charge against the messenger's character for honesty and fidelity to duty, being equivalent to saying that he had permitted such passenger to ride there for pay.

Martin died prior to the trial of the cause. His depositions had been taken before his death, and therein he testified that he did not, at the time of the letter to Edgell, or at any time before or after, have any ill will toward plaintiff. He had no knowledge of or acquaintance with plaintiff before the sending of the letter. The communication was made on the report received by him, which he believed to be correct. It was in good faith and with the object and for the purpose of benefiting the railroad's service. He had no ill will against the plaintiff whatever; in fact, did not know him, and to the best of his knowledge had never seen him. The letter was written because the rules of the railroad company prohibited the carrying in baggage or express cars of any one other than authorized employés. There existed between witness, as general superintendent of the railway company, and Mr. Edgell, as superintendent of the express company, a confidential business relation with reference to the employment and services rendered by plaintiff. The arrangement was that the express company employ men as joint express messengers and baggagemasters, pay them the full amount of their salaries, and bill against the railroad company each month for a certain percentage of the salaries paid. The understanding was that these men were subject to the rules and regulations of the railroad company, and were to be satisfactory to the railroad company in the manner of attending to their business and conduct, etc., while in the service on the train, and that any unsatisfactory business matters or conduct, or any other matters that were not satisfactory to good discipline or prejudicial to good service, should be reported to the express company, which had the employing of the men. The communication was intended solely for the information of Edgell as superintendent of the express company, and for no one else, save that it could be shown to plaintiff, if he desired to see it. He did not expect or authorize its contents to be communicated to any other person. The letter was written entirely upon information

furnished concerning matters of service on the trains of the railway company. He believed the statements contained therein to be true; and the same was conveyed to the superintendent of the express company without any ill feeling or malice whatever toward plaintiff, simply and truly as a business publication, and without any personal feeling or ill feeling whatever.

Plaintiff testified as follows:

"The reason I was discharged was that they claimed I carried a passenger in the car. Mr. H. Martin, superintendent and general manager of the I. & G. N. made that charge against me. * * * I never carried a passenger in the car in which I was performing my duties. * * * I know H. Martin, superintendent and general manager for the receiver of the I. & G. N. His headquarters were at Palestine, Tex., and I was at that point at times; would be in Palestine every three or four days. I met Mr. Martin there personally. His attitude toward me was cool. I met Mr. Martin a few months before this letter was written. He was always cool and distant toward me. Sometimes he would recognize me, and sometimes he would not. I was discharged on November 1, 1910. I wrote to Mr. Martin twice after I was discharged, and did not receive an answer to either letter. I addressed those letters to Palestine, Tex., in Mr. Martin's official capacity, and put a stamped, self-addressed envelope in one of them. The letters I wrote to Mr. Martin never came back to me. I wrote those about ten days or two weeks after I was discharged. I went to see Mr. Martin twice to get him to investigate the charge. I went up to see him and told him the letter was false, and I would like to get him to investigate and withdraw the charge. He treated me very cool and said he couldn't do anything for me. That was all there was to it. He would not discuss it with me at all. That was the first time I went to see him. I went back again about two weeks after that, I believe it was, and saw him again and begged him to investigate the matter; asked him to investigate it; told him the charge was false that there was nothing to it. He just told me that that was all there was to it; he wouldn't have anything more to do with it. I told him I was innocent, did not know anything about it, did not carry this party, that there was a mistake somewhere, and that I would like for him to investigate the charge. He said he was through with it, didn't have any time to talk to me anything about it, and waived me out. He never at any time gave me an investigation. These were the only two times I went to Mr. Martin. I wrote him twice and received no answer to my letters. Then I went to see him twice and begged him to make an investigation on account of my innocence. He told me he would not touch the matter, would not investigate it, and waived me out. That was the end of my transactions with him. * * * I tried to straighten it up every way I knew how with Mr. Martin, and he would not give me a hearing. I had conversations with him before I went to call on him about this matter. He was then cool toward me. I don't know what kind of a man he was, but that is the way he treated me when I saw him. * * * All

Mr. Martin said was that he would not investigate; would not have anything else to do with it. * * * Beatty told me if I would go and see Mr. Martin and straighten it up he would put me back on the run. I tried to do that. I never did anything to incur the displeasure of Mr. Martin. I went to him and begged him to put me back; told him I was innocent of the charge. Asked him for an investigation, and he would not hear to me at all."

He also testified:

"Mr. Martin's manner was not cool and dignified with others altogether. As to whether or not he was a quiet and dignified man, and had little to say to anybody, I don't know, because I never had much to do with him; just at times I would see him and that is all I know of him. * * * I never had any trouble with Mr. Martin in my life."

Parrish, the detective operative, testified by deposition to the truth of the charge.

The jury, in response to special issues submitted, found the charge against plaintiff false, that Martin was actuated by malice against plaintiff in writing the letter, that by reason of the letter plaintiff was discharged, and that the letter tended to injure his reputation, exposing him to financial injury, and placed his damages at $6,000. Judgment was thereupon rendered in favor of plaintiff in the amount so found, and an appeal resulted in the affirmance of the judgment. 185 S. W. 402.

[1] When a communication is fairly made by one in the discharge of a public or private duty, legal, moral, or social, of perfect or imperfect obligation, or in the conduct of his own affairs, to one who has a corresponding interest or duty to receive such communication, the occasion is privileged. Mo. Pac. Ry. v. Richmond, 73 Tex. 568, 11 S. W. 555, 4 L. R. A. 280, 15 Am. St. Rep. 794; Toogood v. Spyring, 1 C. R. M. & R. 181; Somerville v. Hawkins, 10 C. B. 183; 18 Halsbury, Laws of England, § 1263.

[2] From the falsity of the charge or imputation, unless the occasion is privileged, malice is inferred. This inference arises from the fact that no motive other than malice appears. If the occasion is privileged, a proper and sufficient motive is shown; and thereby the inference of malice is repelled, and in lieu thereof the presumption obtains that the communication was made in good faith. It then devolves upon the plaintiff to establish, by evidence other than the falsity of the charge or imputation, that malice in fact existed. Bradstreet Co. v. Gill, 72 Tex. 115, 9 S. W. 753, 2 L. R. A. 405, 13 Am. St. Rep. 768; Lewis v. Chapman, 16 N. Y. 369; Klinck v. Colby, 46 N. Y. 427, 7 Am. Rep. 360; Denver Pub. Warehouse Co. v. Holloway, 34 Colo. 432, 83 Pac. 131, 3 L. R. A. (N. S.) 696, 114 Am. St. Rep. 171, 7 Ann. Cas. 840.

[3] The malice which avoids the privilege

is actual or express malice, existing as a fact at the time of the communication, and which inspired or colored it. Such malice exists where one casts an imputation which he does not believe to be true, or where the communication is actuated by some sinister or corrupt motive or motives of personal spite or ill will or where the communication is made with such gross indifference to the rights of others as will amount to a willful or wanton act. Bradstreet Co. v. Gill, supra; Jackson v. Hopperton, 16 C. B. (N. S.) 829; 18 Halsbury, Laws of England, § 1316.

[4] Actual or express malice need not be proven by direct or extrinsic evidence. It may be inferred from the relation of the parties, the circumstances attending the publication, the terms of the publication itself, and from the words or acts of the defendant before, at, or after the time of the communication; but it must be evidence from which the jury may infer malice existing at the time of publication and actuating it. Gassett v. Gilbert, 6 Gray (Mass.) 94; Jackson v. Hopperton, supra; 18 Halsbury, Laws of England, §§ 1304 and 1316.

[5] If one makes a statement, believing it to be true, he will not lose the protection arising from the privileged occasion, although he had no reasonable ground for his belief. 5 Labatt's Master & Servant, 6386; Hemmens v. Nelson, 138 N. Y. 517, 34 N. E. 342, 20 L. R. A. 440; Clark v. Molynoux, L. R. 3 Q. B. Div. (C. A.) 237; Harris v. Thompson, 13 C. B. 333; Jenoure v. Delmege, [1891] A. C. 73.

In the last-cited case Lord Macnaghten observes:

"The privilege would be worth very little if a person making a communication on a privileged occasion were to be required, in the first place, and as a condition of immunity, to prove affirmatively that he honestly believed the statement to be true. In such a case bona fides is always to be presumed."

[6] Martin's letter was clearly a privileged occasion. The communication was made by him, as superintendent of defendant, in reference to a matter in which he as superintendent was interested, to Edgell, as superintendent of the express company, who had a corresponding interest to receive the same. Martin had a right, and was under obligation, to give the information to Edgell. The evidence is undisputed that Martin believed the information true.. While the charge was made without an investigation, and in reliance upon a report made by a detective agency, it is not shown that Martin at the date of the publication had any reason to doubt the correctness of the report.

Applying the language of the court in Hemmens v. Nelson, supra, to the present case, the question is not whether the charge was true or false, nor whether Martin had sufficient cause to believe that plaintiff did carry the passenger, or whether Martin acted hastily or through mistake, but the question is, the occasion being privileged, whether there is evidence for the jury that Martin knew or believed it to be false. Martin may have arrived at conclusions without sufficient evidence, but the privilege protects him and the defendant from liability on that ground until the plaintiff has overcome the presumption of good faith by proof of a malicious purpose to defame him under cover of the privilege.

Martin's letter clearly and succinctly stated the cause of the request for plaintiff's dismissal from the service:

"Relieve O. O. Edumundson from joint service on account of carrying passenger in baggage car No. 6 arriving Palestine July 26th."

The language of the letter does not warrant the construction that plaintiff received pay from the person permitted to ride in the car. The report of the detective agency upon which the letter was based clearly negatived such charge. The carrying of a passenger in a baggage or express car was the violation of a rule of the railway company. It is manifest from all the evidence, including that of plaintiff, that the rule was of importance, and the charge of its breach a serious charge. The collection of some insignificant sum for passage appears to have been the least consideration in the promulgation and enforcement of the rule. The rule is predicated upon the fact that many very valuable packages are transported in express cars, and it is dangerous to life and property for a messenger to permit an unauthorized person to ride therein.

At the date of the publication of the letter the act of March 20, 1909 (Laws 1909, c. 89) amending the act of April 5, 1907 (Laws 1907, c. 67), known as the "black-listing statute," had been passed, and had not then, though it has since, been declared unconstitutional. Under its provisions, certain corporations, including railroad and express corporations, were required, under heavy penalties, upon request of a discharged employé, to give a written statement of the cause of his discharge; so that the statement of the cause for the request of plaintiff's dismissal was to enable the express company to comply with a supposedly valid act then in force, as well as in virtue of the agreement between the companies. The communication does not contain intrinsic evidence of malice, stating only what was reasonably necessary and proper in conveying the information; in other words, the privilege was not exceeded by the style or language of the communication.

While plaintiff testified that he had met Martin prior to the publication, it is evident that the acquaintanceship was most casual.

He knew nothing about Martin; had had no dealings with him; there had been no trouble of any character between them. Martin had no recollection of ever having met plaintiff. He testified unequivocally that he had no ill will or malice against plaintiff before or at the date of the publication, or subsequent thereto. Plaintiff and Martin were to all intents and purposes strangers one to other, and the testimony of plaintiff that Martin treated him coolly on meeting him, standing alone, has no evidential value. From an examination of the record, we are convinced that there is no evidence of actual malice in the conduct of Martin toward plaintiff prior to or at the time of the publication.

Edgell, upon receipt of the letter, placed a copy in his file, and forwarded the original to Beatty to effectuate the discharge of plaintiff; and Beatty, upon request of plaintiff, gave him a copy. This, under the evidence, was the extent of the publication. The letter was a confidential business communication, having in view the interest of the companies and that of the public, through competent and reliable service, and was so treated by Martin and the officers of the express company. It is clear that Martin used only the ordinary and reasonable means of giving effect to the privilege; there being no excessive publication of the information, and nothing in the conduct of Martin or the express company officials evidencing an abuse of the occasion by undue publication of the charge.

In Missouri Pacific Railway Co. v. Richmond, supra, the railroad company was sought to be held for libel in the publication of a pamphlet by one of its officers containing a list of the men discharged and the cause of their discharge. The following passage from the opinion is applicable herein:

"There can be no pretense that the officer of the company who caused the pamphlet to be published was actuated by ill will toward or desired to injure appellee, who was a stranger to him. The evidence of that officer, uncontradicted, was in substance that he had the pamphlet published; that it was not issued with any bad feeling or malice toward plaintiff or for the purpose of injuring him or any one else; that the book was gotten up for personal convenience and private information of the officers of the company only, in order that they might protect the lives and property of the public and also the interests of the defendant by securing to the company only good, careful, and reliable men. That he did not know plaintiff; that there were about 24,000 persons in the employ of defendant at the time the pamphlet was printed; that it was necessary to have this discharge list in order to guard against re-employing men who had proved themselves incompetent or untrustworthy; that he printed about 100 copies of the book and sent them to officers of the company only, and if one ever got outside of keeping of proper officers it must have been surreptitiously obtained."

[7] The occasion being privileged, the presumption of good faith obtained. The onus was on plaintiff to overcome this presumption. There was, as we have seen, no intrinsic evidence of malice in the publication, nor any extrinsic evidence of malice on the part of Martin prior to or at the time of the publication. The conduct of Martin in failing to answer plaintiff's letters, and his refusal to investigate, is not inconsistent with bona fides. Harris v. Thompson, 13 C. B. 333. This subsequent conduct is the only evidence of express malice. The conduct may be regarded as a circumstance to show the existence of malice subsequent to the date of publication, and it may raise a surmise or suspicion of malice at the date of publication. It does not, however, carry with it that degree of probative force necessary to form the basis of a legal inference of the existence of malice at the time of publication, and falls short in legal contemplation of "any evidence" that Martin, in the publication, was actuated by malice.

We conclude that the evidence was not sufficient to raise the issue of actual malice existing at the date of the publication. Joske v. Irvine, 91 Tex. 574, 44 S. W. 1059.

The occasion being privileged, and there being no evidence of actual malice, it follows that the peremptory instruction in its favor requested by defendant should have been given, unless, as contended by plaintiff, the statutes pertaining to libel as codified in 1911, in force at the date of the trial, permitted a recovery upon proof of the falsity of the charge, without reference to malice.

The act of 1901 (Acts 27th Leg. c. 26) clearly defined actionable libel. It was a broad and comprehensive enactment, intended to cover the subject in its entirety, and materially modifying and changing the common-law doctrine theretofore recognized and enforced in this state. Guisti v. Galveston Tribune, 105 Tex. 497, 150 S. W. 874, 152 S. W. 167.

Section 3 of the act declared the publication of certain matters by newspapers or periodicals privileged. The act made no other or further provision for privileged communications. Section 4 of the act reads as follow:

"Nothing in this act shall be construed to amend or repeal any penal law on the subject of libel, nor to take away any existing defense to a civil action for libel, nor shall this act affect any suits now pending, or that may hereafter be brought upon a cause of action arising prior to the taking effect of this act."

In the codification of 1911 all of section 4 hereinabove quoted, was omitted, except the provision with reference to amending or repealing any penal law on the subject of libel. Article 5598, R. S. 1911. In 1917 (Laws 1917, c. 206 [Vernon's Ann. Civ. St. Supp. 1918, arts. 5598, 5598a]) article 5598 was

amended so as to expressly preserve any theretofore existing defense to a civil action for libel, either at common law or otherwise.

That the occasion was privileged was an existing defense to a civil action of libel, and as such was preserved under the act of 1901, and by the subsequently amended article 5598. The effect of the omission by the codifiers upon this defense, where the publication was subsequent to the adoption of the Revised Civil Statutes, and prior to the amendment of article 5598, need not be considered herein.

The publication which was the basis of this action was made subsequent to the passage of the act of 1901, and prior to the adoption of the Revised Civil Statutes of 1911, though suit was filed and trial had after the adoption of the Revised Civil Statutes, and before the amendment to article 5598. Construing the omission as a repeal of the omitted part of section 4 of the act of 1901, such repeal could have no effect upon the defense of privileged occasion in this action. Section 16, art. 1, of our Constitution provides that "no * * * retroactive law * * * shall be made." This provision of the Constitution, as stated in Mellinger v. City of Houston, 68 Tex. 37, 3 S. W. 253—

"must be held to protect every right, even though not strictly a right to property, which may accrue under existing laws prior to the passage of any act which, if permitted a retroactive effect, would take away the right. * * * It must necessarily be held that a right, in a legal sense, exists, when in consequence of given facts the law declares that one person is entitled to enforce against another a claim, or to resist the enforcement of a claim urged by another."

[8] At the date of the omission by the codifiers, the defense of privilege was a vested ground of defense. A right of defense, not technical, but substantial, resulting in immunity from liability, which has fully vested, is as sacred and as important as a right of action, and is protected from any retroactive legislation in like manner as a vested right of action. 12 C. J. 973.

[9] Aside from this, we are of opinion that section 5 (Vernon's Sayles' Ann. Civ. St. 1914, p. 4863) of the act adopting and establishing the Revised Civil Statutes protects the defense herein; that section providing in part as follows:

"That the repeal of any statute, or any portion thereof, by the preceding section, shall not affect or impair any act done, or right vested or accrued, * * * but every such act done, or right vested or accrued, * * * shall remain in full force and effect."

We are of opinion that the judgments of the district court and Court of Civil Appeals should be reversed, and judgment here rendered for the plaintiff in error.

PHILLIPS, C. J. We approve the judgment recommended in this case.