TYLER COMMERCIAL COLLEGE et al. v. LATTIMORE.   (No. 3599.) *

Court of Civil Appeals of Texas. Texarkana.
Dec. 20, 1928.

Rehearing Denied Jan. 10, 1929.

*Writ of error granted.

Butler, Price & Maynor and Marsh & McIlwaine, all of Tyler, for appellants.

Smithdeal, Shook, Spence & Bowyer, of Dallas, W. T. Norman, of Rusk, and G. W. Gibson, of Jacksonville, for appellee.

·WILLSON, C. J. (after stating the facts as above). ■ It is the law that (quoting from 17 R. C. L. 341) "a communication made in good faith on any subject-matter in which the person communicating has an interest, or in reference to which he has a duty, is privileged if made to a person having a corresponding interest or duty, even though it contains matter which, without this privilege, would be actionable, and although, the duty is not a legal one, but only a moral or social duty of imperfect obligation."

Appellants insist it appeared that the occasion of Roberts' writing the alleged libelous letter was within the rule just stated, and appeared, further, that there was no evidence of malice on his part and no evidence that he did not in good faith believe that what he wrote was true. Therefore, they say, the trial court erred when he refused to instruct the jury to return a verdict in their favor. Appellee, on his part, insists that the matter in Roberts' letter was privileged only so far as it was a reply to inquiries in Seymour's letter. Those inquiries, he says, were only as to what the records of the school showed as to his work there, and as to whether he had been expelled from the school or had completed its course and received a diploma. He insists that the charge in the letter that he had been "arrested and put in jail for stealing a typewriter"· was not in reply to any inquiry in Seymour's letter, and therefore was not privileged within the rule stated above. And he insists, further, that if ·the publication as a whole was privileged as claimed, there was evidence warranting a finding that it was made maliciously and not in good faith. Therefore, he says, the trial court did not err in the particular claimed by appellants.

■ It is generally held that a publication on ·an occasion like the one in question here is privileged, and therefore not actionable, if all the matter in it, though false, was pertinent to the inquiry made and was ·stated in good faith and without malice. 36 C. J. 1241 et seq.; 17 R. C. L. 341 et seq. And as to privileged matter it is held that the burden of proving bad faith or actual malice on 'the part of the publisher is on the complainant, and must be discharged by evidence other than that furnished by the falsity of the charge and the vehemence of the language used in making it. Simmons v. Dickson (Tex. Com. App.) 213 S. W. 612; Nunn v. Webster (Tex. Com. App.) 260 S. W. 157; Ry. Co. v. Edmundson (Tex. Com. App.) 222 S. W. 181; Ry. Co. v. Floore (Tex. Civ. App.) 42 S. W. 607. In the case last cited the court quoted approvingly the statement in Townshed on Libel and Slander, § 244, that, when the occasion is privileged, "expressions in excess of what the occasion warrants do not per se take away the privilege," and added:

"Although the statements made may have been untrue, malice cannot be implied from the fact of publication, and to sustain an action the existence of evil motive must be proved."

In Nunn v. Webster the court said: "Actual·malice can not be inferred from the character of the language used, without other evidence to indicate it." In Ry. Co. v. Edmundson the plaintiff was employed as a baggage master on one of the railroad company's

trains, and had been charged by one Martin, the company's superintendent, with carrying a passenger in the baggage car in violation of the company's rules. In discussing the law applicable to the case, the court said:

"The question is not whether the charge was true or false, nor whether Martin had sufficient cause to believe that plaintiff did carry the passenger, or whether Martin acted hastily or through mistake, but the question is, the occasion being privileged, whether there is evidence for the jury that Martin knew or believed it to be false. Martin may have arrived at conclusions without sufficient evidence, but the privilege protects him and the defendant from liability on that ground until the plaintiff has overcome the presumption of good faith by proof of a malicious purpose to defame him under cover of the privilege."

A majority of the members of this court think all the matter in the letter to Seymour alleged to be libelous was privileged, if written in good faith and without malice on Roberts' part, and, further, that there was no evidence of probative force showing it was not so written. Therefore they are of the opinion appellants' contention that the trial court erred when he refused to instruct the jury to return a verdict in his favor should be sustained. Conceding that all the matter in the letter, including the charge that appellee had been "arrested and put in jail for stealing a typewriter," was pertinent to the inquiry made by Seymour, the writer does not agree there was no evidence warranting a finding that Roberts did not act in good faith or with malice in writing the letter. It appeared without dispute in the testimony that appellee was suspended for a few days, but was never expelled from the school, and that he was never arrested nor put in jail for stealing a typewriter; and the jury had a right to say from testimony before them that his record in the school was not a "very bad" one. The testimony was that an account of appellee's conduct as a student in the school was kept in writing (which writing was before the jury as evidence) by the school authorities, but that Roberts did not look to it before writing the letter in question. According to Roberts' account of the matter, the only basis he had for his charge that appellee had been arrested and put in jail for stealing was a suggestion made to him by one Thornton, an employee of the school, at the time he (Roberts) wrote the letter, that he (Roberts) ought not to recommend appellee too strongly, because it was his (Thornton's) information that appellee had "been in jail for stealing a typewriter." The fact that Roberts made no effort to ascertain if there was any truth in the information Thornton said he had, and the fact that, instead of advising Seymour that all he knew about appellee's stealing a typewriter was what Thornton said about it,

he, instead, in effect stated it to be a fact within his knowledge that appellee was arrested and put in jail for stealing, was evidence, the writer thinks the jury had a right to say, of bad faith or malice on Roberts' part. Appellee as a witness testified that "near the last of March," 1926, Roberts acknowledged to him that what he wrote about appellee's stealing a typewriter in the letter to Seymour was untrue; yet it appeared he (Roberts), on April 10, 1926, wrote a letter to Seymour in which he complained because Seymour had shown the alleged libelous letter to appellee's father, but made no correction of the false charge he made in that letter about appellee's stealing a typewriter. The writer thinks that was a circumstance the jury had a right to consider as indicating bad faith or malice on Roberts' part. And the writer does not agree that, as urged by appellants, the jury did not have a right to look to the alleged libelous publication itself for evidence of bad faith and malice on the part of the publishers. Ry. Co. v. Edmundson, supra; Cobb v. Garlington (Tex. Civ. App.) 193 S. W. 463. He thinks the jury had such a right and had a right to say that the statement in the letter with reference to giving appellants an opportunity to advise Seymour about office help he needed furnished such evidence.

In conformity to the views of the majority of the members of this court, the judgment of the court below will be reversed, and judgment will be here rendered that appellee take nothing by his suit against appellant.

On Motion for Rehearing.

HODGES, J. In overruling the motion for a rehearing, the majority of the court think it only proper to make a fuller statement of the facts upon which they based their opinion as to the insufficiency of the evidence to show malice. In explaining his conduct in writing the letter to Seymour, Roberts testified as follows:

"In the letter that I wrote to Mr. Seymour in reply to that letter (the letter of inquiry from Seymour), in which it is stated that the plaintiff, Rex Lattimore, was arrested and put in jail for stealing a typewriter, when I wrote that letter as to what information I received about that matter, I will state that when I received the letter I did not know the young man personally and I raised the window right next to me and Mr. Thornton was in the Employment Department—there is just a partition wall between, and a window in the wall—and I raised the window and told Mr. Thornton I had an inquiry on one Rex Lattimore and asked if he knew anything about him, and he kind of smiled and said, 'I reckon you know he was arrested and put in jail for stealing a typewriter?' and I said, 'No, I didn't know it;' and I passed that

information into the dictaphone and it was transcribed and I sent it off. The information that I gave in my letter to Mr. Seymour in reply to that matter was solely based on the information I had obtained from Mr. Thornton."

The witness further stated that he was acquainted with Mr. P. A. Botts, who occupied the position of principal in the school in 1923 and until the early part of 1925. As such principal, it was the duty of Botts to supervise the students and maintain discipline. All misconduct was reported to him. Continuing, the witness said:

"As to what was said to me by Mr. Botts about Rex Lattimore, I will state that he came to me on several occasions—I do not know how many—complaining about him not being the kind of student he ought to be, that he disregarded the regulations of the school by being absent, and we have a rule during the week that students are not supposed to be out of their rooms after eight o'clock and he persisted in going to the skating rink in violation of that rule; I say he told me that. Those reports were made to me by Mr. Botts before I wrote this letter. In writing the letter in behalf of the Tyler Commercial College to Mr. Seymour, that has been introduced in evidence here and upon which this suit is based, I was acting on the information I had from Mr. Botts and Mr. Thornton. I did not know anything about Mr. Lattimore myself, except I saw him pass back and forth in school. My relations with him had been friendly as far as I know; I never had any friction with him at any time."

Thornton, who was connected with the Tyler Commercial College at the time the letter to Seymour was written by Roberts, testified in part as follows:

"As to the occasion of Mr. Roberts making inquiry of me about Mr. Lattimore, he had received a letter and raised the window between he and I and asked me about it—about Mr. Lattimore. As to the inquiry he made about Mr. Lattimore, I could not recall the exact words that he asked me; in substance he just wanted to know what about him. In my reply to that inquiry I just said, 'W. M., I wouldn't recommend him too strongly because it is my information that he has been in jail for stealing a typewriter.' * * * I couldn't recall anything against him or for him as a student there; as far as I recall there was nothing against his record as a student then. I told Mr. Roberts the source of my information. The substance of what I told him was that I had gotten it from one of the officers here. I told him it was from Mr. Langston. I could not recall the words I used. I do not know that Mr. Roberts asked me where I got my information. As to whether I am confusing in my mind the information on which I acted with some statement I made to Mr. Roberts and whether I mean to say I

acted myself on information in making the statement to Mr. Roberts or whether I mean to say that I told Mr. Roberts that Mr. Langston had told me that Mr. Lattimore had been arrested and put in jail for stealing a typewriter, I will state that I am sure that is the way it was; well, I was just acting—in telling him what I did I was acting on the information I had. As to whether I acted on that information myself or whether I told Mr. Roberts the source of my information, I will say, well, I acted on the information myself—I just acted on it myself."

P. A. Botts testified by deposition in part as follows:

"As to whether the conduct and deportment of said R. C. (Rex) Lattimore was good or bad during the time he was a student in said college, I will state that I would say that his conduct was unsatisfactory as a student. It was bad by continued violation of the rules of the school. Said R. C. (Rex) Lattimore was suspended from said college; he was suspended by myself for a period of fifteen days. W. M. Roberts was president of the Tyler Commercial College during the time I was connected with said college. W. M. Roberts was out of the city at the time of the suspension of said Lattimore, but returned before the fifteen day limit had expired. I did, several times, report to said W. M. Roberts the record, conduct and deportment of said R. C. (Rex) Lattimore. I reported in general that Rex Lattimore was not doing satisfactory work as one of his capability could do, and that his record was not good."

John W. Glenn, secretary and treasurer of the Tyler Commercial College, testified as follows:

"Mr. Roberts talked to me about this letter (the letter to Seymour). He said he made the statement on the strength of Mr. Thornton's answer regarding Mr. Lattimore and that that was all the information he had. He did not tell me that he found out it wasn't true; he just said he didn't know anything about it other than this information he had at the time."

Lattimore, the plaintiff in the suit, testified as follows:

"I went to Tyler along the latter part of March, and went to see Mr. Roberts up there. I had a conversation with him. I went into his office and talked to him and asked him why he wrote such a letter and at first he didn't seem to understand. I told him I knew about the letter he had written Mr. Seymour and asked him why he charged me with such a thing as that and he didn't know what to say. He told me that he had received the information from one of his employees and I asked him, "Did you write such a letter like that just on something that one of your employees might say? That is very serious; you should look into that. I would delve into

the facts before I would write such a letter.' Mr. Roberts told me that he was indeed sorry that he had written the letter, after having thought it over, and he seemed to be very much—I will do my best to remember the substance of the conversation. He told me that he would be willing to advertise that he had written and mailed a falsehood concerning me provided I was willing to wipe the slate off on both sides. Those were his exact words. That was very near the last of March."

In a deposition introduced in evidence upon the trial, the plaintiff, after admitting that he had been suspended from school for writing an anonymous letter to the principal, testified:

"I have often wondered what caused Mr. Roberts to write such a letter as this; I really do not know why he did it. I have already told Mr. Price that my personal relations with Mr. Roberts were friendly. He dismissed me from school on account of my having written a letter to Mr. Botts, the principal of the school. I admitted that I had written the letter. I was in the wrong about that; in the first place I know I should not have written an anonymous letter, and in the second place I should not have sent it to the principal of the school. * * * When Mr. Roberts talked to me there was not a bit of bitterness between us—at that time Mr. Roberts was entirely fair. On March 12, 1926, I resided in Cherokee County; my home was there at that time. While I have been taken away from Cherokee County in my different lines of work, that county has been my home all the time. I never heard of Mr. Roberts making any complaint about my being an unsatisfactory student, except on account of that letter."

■ When the publication alleged to be libelous is published on a privileged occasion, as in this case, there is no presumption of malice on the part of the writer, and the law imposes upon the plaintiff the burden of proving actual malice. Simmons v. Dickson (Tex. Com. App.) 213 S. W. 612; I & G. N. R. Co. v. Edmundson (Tex. Com. App.) 222 S. W. 181; Nunn v. Webster (Tex. Com. App.) 260 S. W. 157. In the first case cited the court said:

"When a publication is conditionally privileged, the law raises the presumption of good faith and want of malice; and to hold, in such a case, that malice can be inferred from the character of the language used alone would, in our opinion, destroy the force of the privilege, This view, we think, is in accord with the great weight of authority in this country and with previous holdings of our Supreme Court."

The court then quotes with approval the following language used by the Supreme Court of Colorado:

"The presumption which attaches to a writing written on a privileged occasion is that it was written in good faith and upon probable cause. As said by Justice O'Brien, in Hemmens v. Nelson, 138 N. Y. 524, 20 L. R. A. 440, 34 N. E. 342 [344]: 'The question is not whether the charge is true or false, nor whether the defendant had sufficient cause to believe that the plaintiff sent the letter, or acted hastily, or in a mistake; but the question, is, the occasion being privileged, whether there is evidence for the jury that he knew or believed it to be false. The defendant may have arrived at conclusions without sufficient evidence, but the privilege protects him from liability on that ground until the plaintiff has overcome the presumption of good faith by proof of a malicious purpose to defame her character under cover of the privilege.' 'This kind of malice,' says Justice O'Brien, in the case cited, 'which overcomes and destroys the privilege, is, of course, quite distinct from that which the law, in the first instance, imputes with respect to every defamatory charge, irrespective of motive.' It has been defined to be an 'indirect and wicked motive which induces the defendant to defame the plaintiff.' "

The court also quotes with approval the following language used by our Supreme Court in Cranfill v. Hayden, 97 Tex. 544, 80 S. W. 609:

"We understand the law to be that a communication, made in good faith in reference to a matter in which the person communicating has an interest, or in which the public has an interest, is privileged if made to another for the purpose of protecting that interest, and that a communication, made in the discharge of a duty and looking to the prevention of wrong towards another or the public, is so privileged when made in good faith. In such cases, although the statements made may have been untrue, malice connot be implied from the fact of publication and to sustain an action in which the existence of evil motive must be proved."

■ We are unable to find in the testimony in this case any evidence whatever that would tend to prove that Roberts wrote the letter to Seymour with any purpose or design to injure the plaintiff. It may be true that, under certain circumstances, the language of an offensive publication may furnish evidence of an evil or malicious motive on the part of the writer, as when he uses language which expresses ill will or unfriendly feeling towards the person whose character is defamed. But when, as in this case, the publication merely purports to state facts, which may be true or untrue, and without disclosing any feeling indicative of malice or ill will, the language of the publication cannot be looked to as furnishing sufficient proof of malice. The mere fact that what is said is untrue and is calculated to damage the reputation of the plaintiff is not sufficient, in the absence of other evidence of malice.

When the law imposes upon the plaintiff in a suit of this character the burden of proving malice, it means that he must do more than create a mere suspicion that malice may have existed in the mind of the writer. I. & G. N. R. Co. v. Edmundson, supra; Joske v. Irvine, 91 Tex. 574, 44 S. W. 1059.

For the reasons stated, we think the motion for a rehearing should be overruled.