## AMERICAN SURETY CO. OF NEW YORK et al. v. THOMPSON et al. (No. 3752.)

Court of Civil Appeals of Texas. Texarkana. Dec. 18, 1929.

Rehearing Denied Jan. 9, 1930.

R. L. Stennis, Turner, Rodgers & Winn, J. H. Synnott, and Adair Dyer, all of Dallas, for appellants.

J. W. Hassell and F. J. Scurlock, both of Dallas, and Freeman, McReynolds & Hay, of Sherman, for appellees.

HODGES, J. This appeal is from two judgments entered in two cases which were consolidated in the trial court. The facts disclosed by the pleadings and the evidence are, in substance, as follows: On May 27, 1920, W. L. Morgan, one of the appellants, filed in the office of the secretary of state an application for a permit to promote and sell stock in a corporation to be organized and chartered under the laws of the state of Texas in accordance with what was then known as the "Blue Sky Law" (Gen. Laws 1913, 1st Called Sess. c. 32). The application gave the name of the corporation as the "Southwestern Tablet Company." The purpose for which it was to be incorporated was "the transaction of a printing business, and in connection therewith the sale of goods, wares and merchandise, of a stationery and blank book manufacturing business"; the amount of the capital stock to be $125,000.00 divided into 1,250 shares of the par value of $100 each. The commission to be paid on the sale of stock was 10 per cent. in cash or stock; promotion fees, none; incidental expenses, none, except an attorney's fee of $50; charter fees, $170; franchise tax, $62.50; permit fees, $20. The application further provided: "The promoters and those having in charge the organization and sale of the stock of said proposed corporation propose to sell its stock and organize the corporation in the following manner, to-wit: They propose to sell the stock as quickly as possible after receiving the permit herein applied for. * * * And pay all expenses of organization out of the 10% allowed for selling the stock. * * * The stock will be sold partly by the promotor and partly by commission brokers." The names and addresses of the directors of the proposed corporation for the first year were stated. Among them were appellants Morgan, Sansom, and Carlton. The officers named were W. L. Morgan, Chas. Riley, and A. Sansom. Morgan, Carlton, and Riley were named as trustees who were to hold the money and other things of value collected by the promoters of the corporation. The Guaranty Bank & Trust Company of Dallas, Tex., was designated as the depository. The application was sworn to by Morgan, and was accompanied by blank forms of note and subscription blank to be used; the latter containing the following provision:

"It is also understood and agreed that unless all of the capital stock of said corporation is not subscribed in good faith and by responsible parties within a reasonable time and the company incorporated immediately after all the capital stock is subscribed, then this subscription shall be null and void and any money paid by me shall be returned; otherwise to be in full force and effect.

"It is agreed that the amount of commission and all other incidental expenses incident to the sale of such stock shall not exceed 10% of the capital stock. It is also agreed and understood that the commission paid for the sale of shares mentioned herein shall not exceed 10% of the amount of the subscription."

At the time of filing that application, Morgan also filed his bond in the sum of $10,000, with the American Surety Company of New York as his surety. The bond was payable to C. D. Mims, secretary of state, and his successors in office, and contained the following condition:

"The condition of this obligation is such, however, that in the event the facts set forth in said application for a permit and the proof and statements offered by us to the Secretary of State upon which said application is based are not true, and that the undersigned applicant fails to comply with all the provisions of Chapter 32 of the General Laws passed by the First Called Session of the 33rd Legislature in the sale of the stock of said proposed corporation in so far as said Act is applicable, then this obligation shall be null and void; otherwise it is to remain in full force and effect. It is further provided that should any person be induced to purchase any stock of said proposed corporation by the appellant, or any one acting for him, by reason of any mis-

representations of any material fact concerning such stock, the such person or persons shall have the right to bring suit upon this bond and this bond shall be subject to and security for such persons so purchasing the stock."

The bond was approved and filed by the secretary of state on May 27, 1920, and the permit issued to Morgan on the same day.

A meeting of the directors of the proposed corporation was held in Dallas on June 3, 1920, and was attended by A. Sansom, W. L. Morgan, W. V. Crockett, John C. Cox, Chas. Riley, and F. R. Carlton. The purpose of the meeting was the selection of officers. At that meeting Morgan was authorized to sell stock in the proposed corporation for a period of two years, ending May 27, 1922. The amount of stock to be sold was $125,000, and all money and notes collected by him were to be deposited in the designated depository subject to the order of the trustees. By-laws were adopted providing for officers and eight directors. It was agreed at that meeting to purchase machinery and equipment for operation. The sum of $12,500 was voted to Morgan "to pay for a list of names for designs for covers" to be furnished by him. A credit of $12,500 was to be entered on the books of the company, in favor of Morgan, upon his filing that list with the secretary.

Some time in June or July of 1920 Morgan visited J. L. Dyer, one of the appellees, who resided at Whitewright, Tex., for the purpose of soliciting a subscription for stock in the corporation. After some negotiations, which need not be here stated, Dyer subscribed for 50 shares of stock. About the same time Morgan also visited G. S. Thompson, a son-in-law of Dyer, who resided in Dallas, and secured Thompson's subscription for 50 shares of stock. On July 19, 1920, Dyer and Thompson each executed four notes of $1,250 each for the stock subscribed. The notes were payable one day after date, 90 days, 6 months, and 9 months, respectively. On September 14, 1920, another meeting of the directors was held, which was attended by Dyer and Thompson, and at which time Dyer and Thompson were elected directors. Morgan reported to the meeting the placing of orders for machinery and paper, etc., previously authorized, and, according to the testimony of Dyer and Thompson, said he was ready to begin business. It was also agreed at that meeting that a building should be leased for that purpose. Dyer and Thompson were called on for the payment of their first two notes, and each paid during September, November, and January sums aggregating $2,-500; the last payment being on January 5, 1921. Some time later Thompson paid $200 additional. A building was leased in December, and some machinery and equipment installed.

During January, 1921, Dyer and Thompson became dissatisfied with the progress made in the collections from those who had subscribed for stock. On Sunday in the early part of February they called on Morgan at Dallas and requested him to show them a list of those who had subscribed for stock, together with the notes and resources of the company. They testified that Morgan declined to furnish the information requested, and that they then demanded a refund of the amount they had paid and the surrender of their unpaid notes. Upon the refusal of Morgan to comply with their demands, they withdrew and placed the matter of settling their difference with Morgan in the hands of Judge Rasbury, an attorney of Dallas, Tex. Some time later a letter was written by Judge Rasbury notifying Morgan and his cotrustees that Dyer and Thompson refused to consent to the manner in which the funds of the proposed corporation were being handled, and demanding a return of what they had paid in on their subscriptions for shares of stock. After receiving that letter, Morgan and his associates decided to operate the business of the proposed corporation under a declaration of trust in order to avoid personal liability. On March 5, 1921, Morgan, Murphy, and Carlton, with the consent of all the interested parties except Thompson and Dyer, filed in the office of the county clerk of Dallas county a declaration of trust, in which Morgan, Murphy, and Carlton were named as trustees. That instrument authorized the trustees named to take charge of all the property and money of the proposed corporation, and, under the name of the Southwestern Tablet Company, engage in the business of "fabricating paper, acquiring, buying, selling paper, commercial printing, bookbinding, manufacturing stationery, loose leaf school specialties in paper, writing tablets, composition note and drawing, writing books and similar articles," etc. The business was then begun and conducted by the trustees for the purpose and in the manner authorized by the declaration of trust until March 4, 1922. On March 14, 1922, Morgan, Murphy, and Carlton applied for a charter. According to the statement accompanying the application for the charter, the full amount of the capital stock had been in good faith subscribed, and $75,000 of the amount paid in. The subscribers named were W. L. Morgan, M. Murphy, and F. R. Carlton. The application recited that the incorporation had been transacting business as an unincorporated association under the name of the Southwestern Tablet Company; that they had transferred the assets of that company to the corporation in payment of the capital stock. The net assets were listed at $124,000. Upon the filing of the application, the secretary of state indorsed thereon, "Allowed a paid up stock of $75,000.00 upon this showing."

It appears from the evidence that Dyer and Thompson were invited to attend the meeting at the time it was determined to conduct the business of the Southwestern Tablet Company under a declaration of trust, but they refused. They also declined to have anything further to do with the business, or to take any part in its proceedings after their demand made upon Morgan in February, 1921. On the 24th day of May, 1921, Dyer and Thompson each filed a suit against Morgan and the American Surety Company of New York on the bond executed by Morgan at the time he secured his permit to organize the corporation. They also joined as defendants the appellants F. R. Carlton and M. Murphy. In March, 1928, the plaintiffs filed amended petitions, in which each alleged, in substance, as follows: That in July, 1920, he was approached by Morgan, who represented that he had obtained a permit from the state authorizing him to operate a corporation, that he then had bona fide subscriptions for $75,000 of a total capital stock of $125,000 from men of prestige and influence, and that he could easily obtain subscriptions for the balance. Morgan further represented that he had subscribed for $31,500 of the stock, and was ready to pay for it in cash; that the permit had been granted by the secretary of state, and the corporation was then ready to begin business. Each plaintiff alleged that, relying upon those representations, he had subscribed for $5,000 of stock and gave notes for the same. Dyer alleged that he later paid $2,500 on his notes, and Thompson alleged that he had paid $2,700. Each further alleged that a bond had been executed by Morgan under the provisions of the Blue Sky Law, with the American Surety Company as surety; that there had been a breach of that bond by reason of the false and fraudulent representations made by Morgan; that the money collected from the subscribers had not been deposited in a bank as required by law, or, if so deposited, it has been withdrawn and used by Morgan and his codefendants for another purpose; that, on a day named, Morgan and his associates agreed among themselves to abandon the effort to organize a corporation, and determined to operate under a declaration of trust and to transfer the property of the proposed corporation to the trust thus created; that they carried out that scheme, making Morgan, Carlton, and Murphy the trustees. It is further alleged that this act on the part of Morgan, Carlton, and Murphy was a conversion of the assets of the proposed corporation and plaintiffs' interest therein to which they had not consented. It is then alleged that no corporation was ever formed, or, if there was, it was not in accordance with the original plan contemplated in the permit issued to Morgan.

The defendants, appellants here, answered by general and special exceptions, general and special denials, and other special pleas which need not be here mentioned. Among other things, Morgan pleaded his discharge in bankruptcy.

Dyer testified as follows: "He (Morgan) told me that he had as subscribers for stock such men as Carlton, whom I knew, and other substantial men. He said he had secured and had $75,000.00 subscribed, and he was going to organize a $125,000.00 corporation and would take $31,500.00 himself and had had the cash in the bank to pay for it. He said he had $31,500.00 in money. * * * He said the other subscribers were first-class business men, and that they were the only kind he wanted. He said he had $75,000.00 in bona fide subscriptions from men able to pay it. He said he had placed this stock among the best people, and he wanted to place the stock and was placing the stock among the people that were using the merchandise, so that he could dispose of it at the least expense from traveling men and overhead expense. * * * Morgan told me that Mr. Carlton had subscribed for $10,000.00 of the stock. Mr. Morgan said he had a permit to do business from the secretary of state, and was under bond to secure the money that was paid in. He said he was authorized to begin business and do business under a permit at any time. * * * I believed what Morgan told me. I believed it was the truth, or I would not have subscribed for the stock. * * * I never subscribed for any stock in a corporation before that. I don't know very much about corporations, and I do not know whether they had to sell all the stock before they could get a charter or not."

He further stated: "I knew there was to be $125,000.00 of stock, and I supposed that it had been sold, or Morgan would not have been ready to do business. * * * Morgan told me he had sold something like $116,000.00 of the stock, and I supposed he had sold the balance. He said that he was ready, and we had to depend on it."

Again: "I think Morgan told me that he had $75,000.00 subscribed by bona fide subscribers, and that he had $31,500.00 himself, when he first came up there to Whitewright to see me in July; and he had that on his circulars. When I subscribed for stock in this company, and when I paid my money in it, I relied, of course, upon Morgan telling the truth; but of course, I did not know anything about Morgan, and it was based on the recommendation that Carlton gave of Morgan; and my opinion at that time was that Morgan was a truthful man and that I could rely on him, or I would not have gone into it."

Thompson testified to substantially the same character of representations as having been made to him by Morgan for the purpose of securing his subscription for stock in the proposed corporation.

In answering the special issues, the jury found, in substance, as follows:

That, for the purpose of inducing the plaintiffs to subscribe for stock, Morgan falsely represented that he had secured a permit, or legal authority, for the corporation at once to begin business. That plaintiffs believed and relied upon that being true. That it was a misstatement of a material fact.

That for the same reason Morgan falsely represented that $75,000 had been subscribed by business men of influence and prestige who would be of great benefit to the company, and that he could immediately place the remainder of the stock. That this representation was relied on by the plaintiffs and was a material fact.

That Morgan, in order to induce the plaintiffs to buy stock, represented that he had subscribed for $31,500 of stock and was ready and able to pay the same in cash. That this representation was untrue, was relied on by the plaintiffs, and was a material misrepresentation.

That Morgan did not disclose to the plaintiffs that $2,500 in stock was to be issued to defendant Carlton without being paid for, but that plaintiffs believed when they subscribed that Carlton was a bona fide subscriber.

That Morgan did not disclose to plaintiffs that he was to receive compensation in stock of $12,500 for promoting the company and $15,000 for cuts and designs. That plaintiffs believed that all subscriptions for stock had been made in good faith.

That Morgan never secured bona fide subscribers for all of the stock of the proposed corporation.

That plaintiffs did not consent to the operation of the Southwestern Tablet Company by Morgan, Carlton, and Murphy as trustees. That, at the time plaintiffs made their payments on their stock, they consented to the use of the funds for the purpose of paying rent on a building and to pay for machinery, material, and labor in carrying on the business of the concern. That they then believed the Southwestern Tablet Company had legal authority to carry on such business.

That money, notes, and other things of value collected from the sale of stock were not deposited in a bank to the credit of the company. That the net value of the assets of the Southwestern Tablet Company at the time the declaration of trust was executed exceeded in value $5,200. That Morgan, in order to induce plaintiffs to subscribe for stock, intentionally misrepresented material facts, and that neither of the plaintiffs contracted in writing to buy the stock.

On those findings the court rendered judgment against Morgan, Carlton, and Murphy and the American Surety Company in favor of Dyer for $3,625, and in favor of Thompson for $3,915. Judgment was also rendered in favor of the American Surety Company against certain other parties on an indemnity bond executed by them.

The assignments and propositions presented in the briefs of the appellants are too numerous to be here considered in detail. We shall therefore discuss only what we regard as the more important questions which they raise.

Among the defenses to the suit on the bond is a plea in abatement setting up the repeal of the statute requiring the execution of a bond by those applying for a permit to sell stock in a proposed corporation. The law in force at the time this bond was executed was the Act of 1913, 1st Called Sess., c. 32, § 4, which contained the following provisions:

Article 1174d (Vernon's Sayles Ann. Civ. St. 1914) provides: "No permit shall be granted unless there shall appear upon the subscription lists and contracts of such corporation or proposed corporation, in bold type, the amount of the commissions, promotion fees and other estimated expenses incident to the sale of such stock, and the interest which the officer, agent, employee or promoter selling or contracting to sell such stock has in such sale; nor shall such permit be granted until the applicants therefor have entered into a bond for not less than one thousand dollars ($1000) nor more than one hundred thousand dollars ($100,000), the same to be fixed by the secretary or commissioner at not more than ten per cent of the stock proposed to be issued. The said bond shall be payable to the secretary or commissioner as the case may be, and his successor in office, conditioned that the facts set forth in the application for such permit, and the proof and statements offered to such secretary or commissioner, upon which the application is based, are true, and that they will comply with the provisions of this act in the sale of the stock of such corporation or proposed corporation. * * *"

Article 1174f provides: "Any person who shall be induced to purchase any stock of any corporation or proposed corporation by the officers, agents, employees, promoters or trustees, by reason of any misrepresentation of any material fact concerning such stock, such person or persons shall have the right to bring suit upon the bond above provided for, and such bond shall be subject to, and security for, such person so purchasing the stock. * * *"

Article 1174g requires that all moneys or other things of value collected by the promoter of a proposed corporation from the sale of its stock or contracts for the sale of its stock shall be deposited to the credit of its proposed officers or trustees, with the exception of amount allowed for commission, promotion fees, and incidental expenses, with a bank or bank and trust company incorporated

under the laws of the state or of the United States.

Article 1174*l* reads: "At the expiration of two years from the granting of a permit under this act if the proposed corporation has failed to organize, then all subscribers must be refunded the amount paid to the promoter or trustee. * * *"

■■ That statute was repealed, or superseded, by an act of the Legislature adopted in 1923, which constitutes the present "Blue Sky Law," and is found in the Revised Civil Statutes of 1925 as articles 579 to 600, inclusive. While the later law contains many restrictions on the sale of stock by promoters of private corporations, it does not retain the provisions of 1913 requiring the execution of a bond such as that sued on. It is contended that the bond, being purely a statutory obligation, the repeal of the statute requiring it, without a saving clause, operated to extinguish any right of action which had theretofore accrued on the bond. Doubtless that would be correct if the bond was for the purpose of securing the payment of a penalty. It is well settled that no person can claim a vested right in a penalty, and for that reason the repeal of a statute authorizing suits for the recovery of civil penalties abates any right of action which had previously accrued. Such a law is not inconsistent with the constitutional provisions protecting vested rights. But we do not regard this as a penal bond. The manifest purpose of the Legislature in requiring its execution was to furnish buyers of stock in corporations and proposed corporations some protection against the fraudulent schemes and damaging deceptions of those engaged in selling such stock. The bond sued on contains these provisions:

"The condition of this obligation is such, however, that in the event the facts set forth in said application for a permit, and the proof and statements offered by us to the said Secretary of State upon which said application is based are true, and that the undersigned applicant do comply with all of the provisions of Chapter 32 of the General Laws passed by the First Called Session of the Thirty-Third Legislature in the sale of the stock of the said proposed corporation in so far as said Act is applicable, then this obligation shall be null and void; otherwise it is to remain in full force and effect. It is provided further that should any person be induced to purchase any stock of such proposed corporation by the applicant or any material fact concerning such stock, the such person or persons shall have the right to bring suit upon this bond, and this bond shall be subject to and security for such person so purchasing the stock; provided, however, that such person shall not be entitled to recover more than the money paid or the actual value of the property given or the labor performed in exchange for such work, with legal interest from the date of the payment or the performance of the service of the transfer of the property."

This is a contractual obligation. It bound Morgan and his surety to reimburse any subscriber for the value of the loss he sustained as a result of a misrepresentation of any material fact concerning the stock which Morgan was selling. Evidently the purpose of the statute in requiring such a bond was to furnish subscribers for such stock with protection against the fraud and deception sometimes resorted to by promoters in securing subscriptions. It was a security upon which subscribers had a right to rely, and presumably did rely, in paying their subscriptions. When by reason of the breach of this bond a cause of action arose, the claim for damages became a vested right which could not be directly or indirectly disturbed by legislative action. Mellinger v. City of Houston, 68 Tex. 37, 3 S. W. 249; International & G. N. Ry. Co. v. Edmundson (Tex. Com. App.) 222 S. W. 181; Frank v. State Bank & Trust Co. (Tex. Com. App.) 263 S. W. 255; International B. & L. Ass'n v. Hardy, 86 Tex. 610, 26 S. W. 497, 24 L. R. A. 284, 40 Am. St. Rep. 870; McLeary v. Dawson, 87 Tex. 524, 29 S. W. 1044; Pacific Mail S. S. Co. v. Joliffe, 2 Wall. (69 U. S.) 450, 17 L. Ed. 806; Ettor v. Tacoma, 228 U. S. 156, 33 S. Ct. 428, 57 L. Ed. 778; Lindemann v. American Ins. Co., 217 Mich. 698, 187 N. W. 331; 25 R. C. L. p. 937, § 190.

It is contended that the plaintiffs' amended petitions filed in March, 1928, set up a new cause of action that was barred by the statute of limitations. We have examined the originals and the amended petitions, and have concluded that the latter are but amplifications of the same cause of action set up in the originals.

■■ During the progress of the trial, and after the plaintiffs had introduced the principal part of their testimony, the trial court permitted each plaintiff to file a trial amendment. Those amendments alleged, in substance, that, at the time he secured their subscriptions for stock, Morgan had failed to disclose to them that the trustees had voted to allow him $12,500 in stock for designs and cuts and $15,000 as promotion expenses, and had failed to disclose to them that Carlton had not made a bona fide subscription for $10,000 in stock. The rule which permits the filing of trial amendment is intended to apply when an exception has been sustained and an amendment is necessary to perfect the pleading. No such situation had arisen when the trial amendments in this instance were filed, and the court might well have refused to permit them to be filed. But in this case there was no reversible error committed, because no injury resulted. The issues presented in the amendments and passed upon by the jury

were not necessary to sustain the judgment rendered.

It is contended that the proof relied on by the plaintiffs established no liability against any of the appellants, and for that reason the court should have given the peremptory instruction requested by the appellants. That contention is presented in several different forms. It may be conceded that some of the issues submitted to the jury were immaterial, but that fact is unimportant if the findings of the jury upon those issues that were material are sufficient to authorize the judgment recovered.

The principal complaint of Dyer and Thompson is that they were induced by the false representations of Morgan to purchase stock in the corporation. Those representations were, in effect, that $116,500 in bona fide subscriptions of stock had been secured from responsible parties, and that the remainder could easily be obtained. The jury found that those representations were untrue, and that, upon the faith of those false representations, Dyer and Thompson had subscribed for stock and had paid their money. These findings are amply supported by evidence not subject to any legal objection, and are sufficient to sustain the judgment rendered against Morgan and the surety company on the bond. The proof shows that Thompson and Dyer lost all they had paid in on their subscriptions for stock.

The next inquiry is, Was there any error in rendering a judgment in favor of the plaintiffs Dyer and Thompson against Morgan, Carlton, and Murphy for conversion? The evidence shows, and the jury so found, that Dyer and Thompson consented that the funds paid in should be used for the purpose of purchasing machinery and equipment and for rent on a building in which to begin business operations. It appears that other interested parties, as well as Dyer and Thompson, had been led to believe that the concern known as the Southwestern Tablet Company was then legally authorized to begin business operations. But the proof shows that, before business operations were commenced, Dyer and Thompson withdrew from the enterprise and demanded a return of their money, and that this demand was refused. After that occurrence Morgan and other interested parties entered into the declaration of trust agreement, which in legal effect was only a form of partnership. Morgan and those who co-operated with him apparently abandoned the project of incorporation, temporarily, at least, and conducted business operations for several months under that form of partnership. Morgan, Carlton, and Murphy, who were named as trustees, took over all the assets of the concern and managed the business of the new enterprise. This was an undertaking to which Dyer and Thompson had not consented.

In taking over the property which belonged to the shareholders, and thus appropriating it, Morgan, Carlton, and Murphy were guilty of converting the interest which Dyer and Thompson owned in those assets. Dyer and Thompson did not consent to such a partnership enterprise, and the appropriation made of their interest was unlawful, and it ultimately resulted in the loss of all the money they had paid in on their subscriptions for stock.

We have considered the remaining assignments of error, and they are overruled without discussion.

The judgment will be affirmed.

### On Motion for Rehearing.

Under the facts of this case, the conversion by Morgan, Carlton, and Murphy of the interests of Dyer and Thompson took place at the time the trust agreement was entered into. The legal effect of that agreement was to organize a partnership composed of those who were parties to it. Prior to that time no partnership had existed among the stockholders of the proposed corporation. The evidence justifies the conclusion that Dyer and Thompson were acting under the impression that the subscribers to stock were legally authorized to begin business, but, if that arrangement be treated as a partnership, it was one from which Dyer and Thompson had a right at any time to withdraw. Thompson and Dyer did withdraw before the trust agreement was formed, and thus terminated whatever partnership there may have been. Thereafter Morgan, Carlton, and Murphy, acting under the terms of the trust agreement, took over all of the property of the proposed corporation without the consent of Thompson and Dyer. The latter not only were not copartners in that enterprise, but were demanding a return of their money and protesting against what Morgan, Carlton, and Murphy were doing. We therefore adhere to the conclusion that this diversion of the funds was, under the circumstances, a conversion.

It is contended with much force that it was incumbent on Dyer and Thompson to prove the value of their interests in the property at the time of the conversion. That issue was not specifically submitted to the jury. The appellees defend the action of the court in failing to submit that issue upon the ground that the facts were undisputed that the interests of Thompson and Dyer were equal to the value of the money they had paid into the concern. We are of the opinion that this contention is correct. It is true a portion of the money which had been paid by the subscribing stockholders had been invested in machinery, but no business operations had taken place, and presumably the machinery was worth what was paid for it.

There is nothing in the record that justified the conclusion that the interest of Thompson and Dyer in the assets converted by Morgan, Carlton, and Murphy was less than the value of the money whch they had paid in.

The motions for a rehearing will therefore be overruled.