The PROCTER & GAMBLE MANUFAC-TURING COMPANY, Appellant,

v.

Don HAGLER, Appellee.

No. 06–94–00012–CV.

Court of Appeals of Texas, Texarkana.

Argued May 17, 1994.

Decided May 24, 1994.

Rehearing Denied June 14, 1994.

Louis P. Bickel, Kathleen M. LaVelle, Akin, Gump, Strauss, Hauer, Feld, Dallas, P. Michael Jung, Strasburger & Price, Dallas, for appellant.

Franklin Jones, Jr., Rosemary Snider, Jones, Jones & Curry, Inc., Marshall, John R. Mercy, Atchley, Russell, Waldrop, Hlavinka, Texarkana, Neal S. Manne, Susman Godfrey, Houston, for appellee.

Before CORNELIUS, C.J., and BLEIL and GRANT, JJ.

## OPINION

BLEIL, Justice.

Procter & Gamble Manufacturing Company appeals an adverse judgment in favor of Don Hagler for libel. The critical issue is whether legally and factually sufficient evidence supports the jury's finding that Procter & Gamble acted with actual malice. We determine that there is some slight evidence but that it is wholly insufficient to support the finding. Because actual malice is a prerequisite to any recovery by Hagler, we reverse and remand this cause for a new trial.

Hagler had worked at Procter & Gamble's Dallas plant for forty years. On Tuesday, February 26, 1991, Hagler left the plant after working a twelve-hour night shift. Hagler was carrying a paper sack. The guard at the plant entrance looked in the sack and saw a pair of coveralls. The guard then asked to see the bottom of the sack. Hagler removed the coveralls from the sack, revealing a business telephone. Hagler stated that the telephone was his, but the guard told him that he still needed a pass to take the telephone from the plant. Hagler left the telephone with the guard, who reported the incident.

Later that day, Hagler's supervisor notified him that the incident was under investigation. Hagler met with the plant's managers and explained that he had purchased the telephone in May 1990 at the request of his former supervisor, Ernest Riley; had lost the receipt; believed that he could not be reimbursed by Procter & Gamble without presenting a receipt; had not been reimbursed; and that Riley had agreed that the telephone belonged to Hagler. Hagler stat-

ed that he had used the telephone at the temporary food trailer, where he had worked the previous summer. When Hagler was later transferred to one of the plant warehouses, Riley told Hagler he could take the telephone with him to his new work assignment. The telephone stayed in Hagler's locker at the warehouse for several months until he decided to take it home.

Hagler paid cash for the telephone, so records from the store were unavailable to confirm his story. Procter & Gamble's records do not indicate that Hagler was reimbursed for the purchase of a business telephone. Procter & Gamble managers interviewed one of Hagler's co-workers, Lou Osborn, and also contacted Riley, who was then working in San Francisco. Osborn remembered accompanying Hagler to buy the telephone, but did not remember purchasing two business telephones herself a few weeks after Hagler made his purchase. Riley recalled sending Osborn and Hagler to purchase office supplies, including a telephone, and also recalled telling Hagler he could take the telephone to his new work assignment. Riley did not recall telling Hagler the telephone was his or having a conversation with Hagler about a lost receipt for a telephone. Another co-worker, Ira Lynn Ward, told Procter & Gamble managers that the telephone Hagler was using in the food trailer was one of the two telephones purchased by Osborn on behalf of the company.

On Thursday, the plant managers voted to fire Hagler; however, Riley sent a fax from San Francisco asserting that he vaguely remembered a conversation about a receipt. The managers postponed finalizing their decision until Riley came to Dallas for an interview. At the interview, Riley stated that,

whatever conversation he had with Hagler about a lost receipt, he was certain it did not involve a receipt for a telephone.

On Monday, March 4, 1991, the managers unanimously agreed that Hagler had violated Procter & Gamble's Rule 12, the company rule prohibiting theft of company property. That rule provides that an individual who violates it will be terminated, regardless of the value of the property or whether it is a first offense. The plant manager, Marty Majestic, posted notice of Hagler's termination for theft on bulletin boards throughout the plant.[1] The notice remained posted for eight days.

Hagler sued Procter & Gamble for libel in May 1991. The trial court granted Hagler's motion for an instructed verdict on the issue of whether the statements in the notice were defamatory per se. The issues of the statements' falsity and Procter & Gamble's actual malice were submitted to the jury, which found in favor of Hagler.

█ In reviewing a no evidence challenge, we consider only the evidence and inferences that support the jury's finding and disregard all contrary evidence and inferences. *Havner v. E–Z Mart Stores, Inc.*, 825 S.W.2d 456, 458 (Tex.1992). If there is any evidence of probative force to uphold the jury's finding, the no evidence challenge is overruled. *In re King's Estate*, 150 Tex. 662, 664, 244 S.W.2d 660, 661 (1951). When reviewing the factual sufficiency of the evidence to support the jury's verdict, we examine all of the evidence and set aside the verdict only if it is so against the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986).

---

1. The notice read:

**INFORMATION**

This is to advise that Warehouse Technician Don Hagler's employment with Procter and Gamble was terminated today, March 4, 1991 for violation of Company rules.
Specifically, as Don was exiting the plant after completing his 12–hour shift at 7:30 a.m. Tuesday, February 26, 1991, security personnel discovered an AT & T Model 610 Memory telephone concealed underneath some clothing in a paper sack that he was carrying out of the plant.

After extensive investigation of this incident, it has been determined that the telephone in question is Procter and Gamble's property and that Don had therefore violated Work Rule #12 as stated in "You and P & G" concerning theft of Company property.
We regret that Don's employment had to be terminated after so many years of service, but Work Rule #12 clearly states that theft of Company property is a terminable offense regardless of the value of the property or if it is a person's first offense.
Personnel Systems Department

▪ Before turning to the evidence, we need to view this workplace libel in its proper perspective. Accusations or comments about an employee by his employer, made to a person having a corresponding interest or duty in the matter to which the communication relates, are subject to a qualified privilege.[2] *See Dixon v. Southwestern Bell Tel. Co.*, 607 S.W.2d 240, 242 (Tex.1980); *Martin v. Southwestern Elec. Power Co.*, 860 S.W.2d 197, 199 (Tex.App.—Texarkana 1993, writ denied); *Schauer v. Memorial Care Sys.*, 856 S.W.2d 437, 449 (Tex.App.—Houston [1st Dist.] 1993, no writ). A communication loses its privilege if made with malice or in bad faith. *Schauer*, 856 S.W.2d at 449. The burden is on the plaintiff to show that the qualified privilege is lost because the defendant acted with actual malice. *Dixon*, 607 S.W.2d at 242; *Gillum v. Republic Health Corp.*, 778 S.W.2d 558, 572 (Tex.App.—Dallas 1989, no writ); *Marathon Oil Co. v. Salazar*, 682 S.W.2d 624, 631 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.). Thus, the focus now is upon what in law constitutes actual malice.

The Supreme Court has held that the First Amendment prohibits a public official from recovering damages for a defamatory falsehood relating to his official duties unless he proves the damaging statement was made with actual malice. *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964). The *New York Times* requirements were later extended to libel suits brought by public figures as well. *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 164, 87 S.Ct. 1975, 1966, 18 L.Ed.2d 1094 (1967) (Warren, C.J., concurring). Actual malice is said not to be ill will, but the making of a statement with knowledge that it is false or with reckless disregard of whether it is true; reckless disregard means a high degree of awareness of probable falsity, for proof of which the plaintiff must present sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. *Carr v. Brasher*, 776 S.W.2d 567, 571 (Tex. 1989).

Although this case involves an employer-employee relationship, not a public official or a public figure, the trial court submitted the case based on the *New York Times* standard of malice. As there was no objection to this standard and no question concerning it was presented on appeal, we do not pass on the proper standard to be used to determine actual malice in an employment libel case. *See Dixon*, 607 S.W.2d at 242 (there being no trial objection to the standard of malice, appellate court did not find it necessary to pass on the proper standard to be applied to a nonmedia defendant). We thus proceed to examine the evidence to support the finding of actual malice as that question was submitted to the jury.

▪ Actual malice may be inferred from the relation of the parties, the circumstances attending the publication, the terms of the publication itself, and from the words or acts of the defendant before, at, or after the time of the communication. *International & G.N.R. Co. v. Edmundson*, 222 S.W. 181, 184 (Tex.Comm'n App.1920, holding approved); *see also Frank B. Hall & Co. v. Buck*, 678 S.W.2d 612, 621 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.) (holding that declarant's knowledge of statement's falsity or serious doubt about its truth can most easily be proved by circumstantial evidence), *cert. denied*, 472 U.S. 1009, 105 S.Ct. 2704, 86 L.Ed.2d 720 (1985). Actual malice embraces a higher level of culpability than mere ill will or animosity. *Shearson Lehman Hutton, Inc. v. Tucker*, 806 S.W.2d 914, 924 (Tex. App.—Corpus Christi 1991, writ dism'd w.o.j.). Proof of malice cannot be inferred from the falsity of the statement alone. *See Casso v. Brand*, 776 S.W.2d 551, 558 (Tex. 1989) (sufficiency of evidence to support finding of actual malice requires more than jury disbelieving defendant's testimony); *Breen v. DeLord*, 723 S.W.2d 166, 170 (Tex.App.—Austin 1986, no writ) (jury's belief that statement was false does not somehow create affirmative evidence that declarant knew it was false). Nor is negligence, failure to investigate, or failure to act as a reasonably prudent person sufficient to show actual mal-

---

2. The trial court concluded that Procter & Gamble was entitled to claim qualified privilege in this case, and that finding is not challenged on appeal.

ice. *El Paso Times, Inc. v. Trexler,* 447 S.W.2d 403, 406 (Tex.1969). A mere surmise or suspicion of malice does not carry the probative force necessary to form the basis of a legal inference of malice. *Edmundson,* 222 S.W. at 185; *Schauer,* 856 S.W.2d at 450; *Marathon Oil,* 682 S.W.2d at 631.

Procter & Gamble asserts that the evidence shows it initiated the investigation of Hagler's suspected theft in good faith based on his suspicious behavior at the plant gate. The telephone was the same "610" model as other telephones used at the plant; the guard had to ask Hagler twice to let her see the bottom of the sack; Hagler's face turned red;[3] the guard had the impression Hagler was concealing something; and even Hagler basically agreed with the incident report and testified that he made a mistake by not carrying the telephone in his hand so Procter & Gamble could not accuse him of trying to hide it.

The warehouse manager, Leeman Vessel, told Hagler that Procter & Gamble was not doing its fact finding like it usually did and to expect the worst. This warning might seem to support the finding of actual malice; however, it could also indicate that management was taking this matter seriously and conducting an extensive investigation. Also, Vessels made this statement on Thursday, the day management first voted to fire Hagler.

There are omissions and inaccuracies in the investigation record. Management twice interviewed Lou Osborn, who accompanied Hagler to the telephone store and corroborated Hagler's explanation regarding his purchase of the telephone. Eugene Washington, who headed the company's investigation, then prepared a summary of Osborn's information, but Osborn testified that this summary contains false statements.

After the two interviews, Vessels asked Osborn to prepare a written statement. Before writing her statement, Osborn asked Vessels if it would help Hagler; Vessels said that it would not. From this, the jury could

have decided that Procter & Gamble did not care about the truth. Conversely, Vessels told Osborn this on Thursday, which is the day that management first decided to terminate Hagler. Management did not know of Riley's fax until Friday, and that is when they postponed firing Hagler. In addition, Vessels made this statement after Osborn had already provided statements during two prior interviews.

Washington summarized all the information for the convenience of the other managers. According to Hagler, this summary left out information favorable to his story, particularly the fact that Riley remembered sending Hagler to buy office supplies, including a telephone. The summary includes Riley's statements that he did not tell Hagler he could have the telephone and did not engage in a conversation with Hagler about a lost receipt.

Washington defended his summary at trial, testifying that Riley had said that he did not have a discussion with Hagler about a lost receipt for the telephone or tell Hagler he could have the telephone. Washington testified that he left out the fact that Hagler was sent to buy office supplies and a telephone because, when deciding what to include in the summary, he did not think that information was relevant to ownership of the telephone. Washington maintained that the summary was meant only as a guide and did not include the entire results of the investigation.

Washington's summary also indicates that Hagler had two different explanations for the telephone, one of which is that Hagler brought the telephone from home and was now taking it back. Washington testified that the guard told him this during the investigation. The security guard's incident report, however, reflects only that Hagler said that he brought the telephone in when he used to work in the food trailer. Washington's testimony that, in Washington's mind, Hagler had two different stories indicates that he read too much into the guard's state-

---

**3.** Hagler is hard of hearing and blushes when he cannot hear what someone is saying. It is undisputed that Hagler did not have his hearing aids on that day; however, the record is not clear whether Hagler explained this to the Procter & Gamble managers during their investigation. He did tell them that he did not hear the first thing the guard said to him, but did hear her ask once to see the bottom of the sack.

ments and erroneously assumed that Hagler was asserting that he brought the telephone from home, not from a telephone store; however, having an erroneous belief is the antithesis of actual malice.

Hagler asserts that Procter & Gamble pressured Riley and coached the documentation of his statements. Riley, however, denied feeling any pressure from Procter & Gamble, but did feel pressure from Hagler to recall a conversation he was positive had not taken place. Hagler also argues that corporate pressure caused Riley to change his story. The fax Riley sent mentioned that Riley did send Hagler to buy office equipment, including a telephone, but Riley's written statement, which he prepared following his meeting with the plant managers in Dallas, does not mention this fact. Riley wrote this statement at the direction of Washington. The statement, however, purports to be only a clarification of certain points, not a repetition of all the information Riley had previously provided.

Procter & Gamble had proof of ownership of the telephone. Company records show that Procter & Gamble purchased three Model 610 telephones for use in the food trailer; no one recalled seeing more than three business telephones in the food trailer. Hagler contends that this "three receipts" story was invented by Procter & Gamble after Hagler's termination; however, Procter & Gamble managers Washington, Ira Ward, Ulysses Yancy, and Eugene Gardner testified that they considered Procter & Gamble's purchase records and testimony from Hagler's co-workers regarding the number of telephones in the trailer when making their decision about who owned the telephone.

It is significant that the plant managers bore no grudge or ill will against Hagler. Hagler himself knew of no one in plant management who bore a grudge or any ill will against him. However, he went on to speculate that because the plant was in the process of shutting down and theft was on the rise, management may have used him as a "scapegoat" in an effort to send a message to other plant employees. Other employees testified that they had not known Procter & Gamble to post a notice concerning the termination of an employee for theft.

Hagler argues that testimony from plant manager Marty Majestic establishes that other employees who stole from the company were not fired. These other employees falsified records that resulted in their receiving undeserved reimbursement or unearned overtime pay. According to Majestic, these other situations fell within another personnel rule, Rule 13, regarding the falsification of company records. Under Procter & Gamble's contract with the union, matters falling within Rule 13 are required to go to arbitration. Unlike Rule 12, the rule applicable to cases concerning theft of company property, Rule 13 does not have a mandatory termination penalty. Also, even if Procter & Gamble terminated Hagler to send a message to its other employees that theft would not be tolerated, this does not mean that Procter & Gamble had serious doubts about who owned the telephone.

Approximately a month after Hagler was fired, Gardner asked Hagler if he had found his receipt. Hagler asserts that this is more proof that management had serious doubts about who owned the telephone. Gardner testified that he asked Hagler about the receipt because he suspected that a fake receipt might be produced. The difficulty with Hagler's position is that, even if the evidence is viewed as showing that Procter & Gamble entertained some doubts, those doubts would not be sufficient to support a finding of actual malice based on the totality of the evidence.

■ Considering only the evidence and inferences favoring the jury's verdict, the jury could have determined that Procter & Gamble made a premature decision about Hagler's guilt and then determined to justify that decision. Certainly there is ample evidence to support the jury's finding that Procter & Gamble's statement was false, that Hagler did not take company property. That finding is not challenged. But, however false the statement or however wrong Procter & Gamble, the circumstances do not indicate that Procter & Gamble acted maliciously. We concede that there may be some evidence to support the finding of actual malice. However, as we have said, actual malice generally requires a higher level of culpability than mere ill will or animosity.

Here, the evidence does not rise to the level of ill will, much less to a higher level of culpability.

For the reasons we have outlined based upon all of the evidence, as detailed above, the jury's finding that Procter & Gamble acted with actual malice is not supported by factually sufficient evidence. *See Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (reversing jury finding for factual insufficiency requires court to detail the relevant evidence and state why the jury's finding is factually insufficient or so against the great weight and preponderance as to be manifestly unjust); *see also Schlumberger Well Surveying Corp. v. Nortex Oil and Gas Corp.*, 435 S.W.2d 854, 858 (Tex.1968) (a vital fact may not be proved by piling inference upon inference).

We reverse the trial court's judgment and remand the cause for a new trial.

GRANT, Justice, dissenting.

The majority opinion does not allow the jury its right to infer actual malice from the relation of the parties, the circumstances attending the publication, the terms of publication itself, and from the words and acts of the defendant's agents before, at, and after the time of the communication.

I respectfully dissent.