**A. Harvey ARANT and Lylla Arant,**
**Appellants,**

v.

**Irvin J. JAFFE, Appellee.**

**No. 17186.**

Court of Civil Appeals of Texas.

Dallas.

Dec. 20, 1968.

Barnett M. Goodstein and Wade Starr, Dallas, for appellants.

Byron L. Williams, of Lyne, Klein & French, Dallas, for appellee.

CLAUDE WILLIAMS, Justice.

A. Harvey Arant and wife Lylla brought this action against Irvin J. Jaffe alleging that Jaffe had uttered certain false and defamatory statements concerning Mrs. Arant and that as a result thereof damages had been sustained for which recovery was sought. Jaffe answered with a general denial and special defenses including, inter alia, that of qualified privilege. Jaffe, in due time, filed his motion for summary judgment, supported by depositions and request for admissions of fact. Plaintiffs filed their answer to the motion but tendered no additional affidavits, depositions, or other summary judgment evidence in opposition to same. The trial court, following hearing, sustained the motion for summary judgment and thereafter entered a take nothing judgment denying plaintiffs any recovery. Plaintiffs appeal. We affirm.

## FACTS

The summary judgment evidence, viewed in a light most favorable to appellants, may be summarized as follows:

Prior to April 6, 1965 appellee Jaffe and his wife had arranged to purchase a residence in the City of Dallas known as 5130 Southbrook Street from Mrs. Ruth Ann Lively. Mrs. Lively conveyed such property to Jaffe and wife by warranty deed on April 6, 1965. It had originally

been contemplated by the parties that Mrs. Lively would vacate the premises on April 15, 1965 but due to the fact that Mrs. Lively's new home had not been completed appellee Jaffe voluntarily, and without any consideration therefor, allowed Mrs. Lively to remain on the premises until her new home was completed and she vacated the Southbrook property. About a week before Mrs. Lively moved out of the Southbrook residence she called Mrs. Jaffe and asked her if it would be all right for her to hold a "garage sale" on the premises on the following weekend so that she might sell a few of her personal belongings. Consent was given to Mrs. Lively, without consideration paid or to be paid, for permission to hold the sale. Prior to that time Mrs. Lively had entered into an arrangement with Mrs. Arant to assist her in holding the sale, Mrs. Arant having held several such sales in Dallas. This arrangement between Mrs. Lively and Mrs. Arant was not communicated to Mrs. Jaffe or to Mr. Jaffe. On Wednesday, April 28, 1965, Mrs. Lively vacated the house, removing therefrom all of her furniture and personal belongings except those she planned to sell in the garage sale. Immediately thereafter, Mrs. Arant began moving other furniture and merchandise into the residence for the sale to be held on the weekend. Among the items moved into the residence by Mrs. Arant were some 620 items of merchandise and furniture, not including clothing, belonging to some fourteen private individuals. In addition to this Mrs. Arant moved in some twenty-five to thirty pieces of furniture obtained from shops in the Decorator Center. Mrs. Lively testified that when she made arrangements with Mrs. Arant to help her hold the sale she was not aware that Mrs. Arant had contemplated putting such a large amount of merchandise in the house. She said when she observed the number of items placed in the residence she became "perturbed".

Mrs. Arant first saw appellee Jaffe when he came to the residence at about 2:00 p. m. on Wednesday, April 28, 1965. She knew that Mr. Jaffe owned the property. She said that she did not know what arrangements had been made between Mrs. Lively and appellee Jaffe with regard to the garage sale prior to the time she moved the merchandise into the house. When Jaffe arrived on the premises he was "very pleasant" but evidenced surprise at seeing so much merchandise in the house. He commented: "My goodness. This couldn't have all been in the house." At that time Jaffe made no express objection to the sale. The following day Jaffe's wife arrived on the premises and was disturbed concerning a leak in the utility room, and upset because a dog had torn up the patio. During the evening of Thursday, April 29, 1965 a friend of Mrs. Arant's, who had been helping her prepare for the sale, drove his automobile over the curbing of the driveway and onto the lawn. At about eleven or twelve o'clock on Friday, April 30, 1965, Jaffe telephoned Mrs. Arant at the Southbrook residence and told her he wanted the sale stopped immediately. When Mrs. Arant asked Jaffe why he wanted to stop the sale he stated that he did not want to discuss it, and wanted no argument, but did want the sale stopped and wanted Mrs. Arant and her associates off of his property. She asked Jaffe to stop by the house on the way home so that she could explain her position, whereupon he said that he would be out within the hour.

Shortly thereafter Jaffe arrived at the residence. Mrs. Arant had not stopped the sale and it was still in progress when he arrived. When Jaffe came in the front door Mrs. Arant said she was standing in the middle of the living room, and appellee said: "I don't want to hear any arguments out of you. I just want you— I want this sale stopped and I want you off of my property by twelve o'clock tonight." Mrs. Arant told Jaffe that his secretary had telephoned and left word for him to call his office. As Jaffe walked to the telephone to make his call he said: "I just want to say one more time that

you are a phony, cheat and a crook and I want you off my property by midnight tonight." After Jaffe finished his phone call Mrs. Arant asked him if he would go with her to another room where they could talk. The two retired into a bedroom where Mrs. Arant tried to convince Jaffe to allow the sale to continue. Jaffe insisted upon her leaving and stated: "If you are not off my property by twelve o'clock tonight, I will have you put off and I will have every bit of merchandise in this house locked in and you won't get a piece of it out." Mrs. Arant replied: "I have heard this twelve o'clock midnight so often that I will tell you right here and now, and I will say it for the last time, that this property, this merchandise, will by some miracle be off of your property by twelve o'clock tonight."

Jaffe returned again to the house about eight o'clock p. m., accompanied by two Greenville Avenue patrolmen. At that time the movers had still not arrived. When Mrs. Arant began explaining to appellee the problem she was having in trying to remove the merchandise from the premises Jaffe told her that he wasn't interested in the problem involved but just wanted the merchandise out by midnight. Jaffe then instructed the patrolmen that: "I want this door locked at twelve o'clock and these people off of my property." He also told the patrolmen: "I want you to understand that I don't want anything taken off the walls, I don't want any carpeting removed from house, no fixtures taken off out of the house." He also said: "I want you to watch these people very carefully and at the stroke of twelve o'clock I want them put off of this property and the doors locked, and anything that's in the house remains."

Mrs. Arant testified that when Jaffe uttered the first words concerning "a phony, cheat, and a crook", same were uttered in the presence of a number of people in the room and were heard by these people. She said that after she told Jaffe she was going to get out of the house he seemed greatly relieved and acted very pleasant.

Concerning her activities Mrs. Arant testified that she had participated in other garage or "estate" sales, as well as the sale in question, as a hobby rather than a business.

When asked concerning the effect of the statements made by Jaffe upon her Mrs. Arant testified as follows:

"A He called me a phony, a cheat and a crook.

Q Is that your best recollection of what was said in its entirety, just—

A I tell you, that kind of put everything else out of my mind, the little chitchat. To the best of my knowledge, he continued talking as he walked to the phone.

\* \* \* \* \* \*

Q What did you understand Mr. Jaffe to mean when he said this, Mrs. Arant?

A Well, I don't know how to answer that. \* \* \*

\* \* \* \* \* \*

Q \* \* \* But what did you think he meant by it?

A That I was misrepresenting it. I guess that's what phony means, that I was cheating people and that I was a crook. I mean, I don't know any other definition of the words.

Q In other words, you think he was just being abusive to you and casting aspersions on your reputation; is that what you're saying?

A Well, I would certainly think so.

Q And that's the way you took it?

A I feel very definitely if anyone has that said to them in front of a group of people, it's an aspersion to their character, particularly the people that don't know you very well.

Q According to your understanding, Mrs. Arant, what is a phony?

A What is a phony? Someone that's not what they pretend to be.

Q Well, perhaps—

A Would be my definition of it.

Q Someone putting on airs?

A Well, it could be applied that way. I don't think in this instance it was directed in that manner at all. I certainly wasn't putting on airs.

Q Well, according to your understanding, what is a cheat?

A Someone that tries to cheat people out of something.

Q Okay. And by the same token, what, to your way of thinking, is a crook?

A Same thing.

Q All right. And it's your testimony, then, your belief that Mr. Jaffe was just being abusive to you and casting aspersions on your reputation in general, is that right?

A Best of my belief and my deepest thinking, I didn't give it any—I could give it no other interpretation. It was pretty unjustified because I'm none of those things.

Q Well, there wasn't any other conversation in connection with those statements to indicate that you had done any other thing, was there?

A No.

Q Any of those things?

A No."

In answer to request for admissions of fact Mrs. Arant admitted that neither she nor her husband had ever had any writing or memorandum signed by Mr. or Mrs. Jaffe or by Mrs. Lively purporting to give them the right to possession of the premises. Mrs. Arant testified that the losses and expenses which she claimed to have sustained were not caused or brought about by anything that Mr. Jaffe said but merely by his stopping the sale.

## OPINION

Seeking reversal of the judgment appellants assign five points of error. The first point is: "The Trial Court erred in granting Appellee's Motion for Summary Judgment in that there were material fact questions to be decided upon a trial of the merits of this case."

In the statement under this point appellants review the contents of their second amended original petition. They then make the statement that after appellee had filed his motion for summary judgment he (appellee) did not file any affidavit denying the allegations in appellants' petition. In the argument and authorities following the statement under Point 1, appellants make these statements:

"Therefore, since Appellee proceeded with his motion for summary judgment without supporting affidavits, the said motion was directed solely to the adequacy of the pleading as a matter of law."

And:

"Since Appellee directed his motion for summary judgment to the sufficiency of Appellants' pleadings, the said pleadings must be examined to see if a good cause of action is plead therein, and whether any defense or defenses plead by Appellee lie as a matter of law, so that no material fact issue is raised."

Furthermore they say:

"As set forth above, when Appellee filed his Motion for Summary Judgment without affidavits denying the allegations in Appellants' Second Amended Original Petition, he directed his motion to the sufficiency of Appellants' pleadings. When he did so, it was equivalent in effect to our old general demurrer."

And, finally, they say:

"Therefore, even if the defamatory words were not actionable per se, which

Appellants say they were, Appellants have plead special damages necessary to plead a cause of action for slander per quod, and the Trial Court erred in granting Appellee's Motion for Summary Judgment because there were material fact issues raised by the pleadings."

It is quite evident that it is appellants' theory that the propriety of the action of the trial court in granting appellee's motion for summary judgment must be reviewed in the light of the sufficiency of appellants' pleadings alone. If such be true then appellants obviously have misconstrued well established principles of judicial review of summary judgment proceedings.

■ Rule 166–A, Vernon's Texas Rules of Civil Procedure, was wisely and carefully promulgated by our Supreme Court to provide a means by which causes of action, or defenses thereto, with no real merit are eliminated without the necessity and cost of judicial time required by long-drawn-out trial which would end with a determination that, on the facts viewed most favorably to a party, the claim or defense is not good as a matter of law.

■ The rule itself is so designed as to set it apart from the other rules designed to test the sufficiency *vel non* of pleadings alone. The summary judgment rule goes much further by permitting the parties to support their motions for summary judgment, as well as their opposition thereto, with affidavits, depositions, requests for admissions, and other "summary judgment evidence." It is this summary judgment evidence, and not the pleadings, that is looked to by the court to determine the existence or nonexistence of issuable facts. Moreover, it has been held that there is a duty on the part of a court to "pierce the pleadings" in determining the question of the existence or nonexistence of issuable facts. Sparkman v. McWhirter, 263 S.W. 2d 832 (Tex.Civ.App., Dallas 1953, writ ref'd).

■ Our Supreme Court has, on several occasions, held that when facts entitling the moving party to prevail have been established by affidavits, admissions, or deposition testimony, a motion for summary judgment will not be denied merely because the opposite party has alleged matters which if proved, would require that a different judgment be rendered. Kuper v. Schmidt, 161 Tex. 189, 338 S.W.2d 948 (1960) ; Gulf, C. & S.F. Ry. Co. v. McBride, 159 Tex. 442, 322 S.W.2d 492 (1958). In *McBride* the Supreme Court also reiterated the well established rule that in summary judgment proceedings when the moving party supports his motion with affidavits or other summary judgment evidence it then becomes incumbent upon the adverse party to come forward and file counter affidavits or other summary judgment evidence in opposition thereto and, failing to do so, suffer the consequences thereof.

■ Of course, in summary judgment proceedings the burden is cast upon the moving party to establish by competent summary judgment evidence the nonexistence of issuable facts. The rules which must be applied most stringently against the moving party are concisely set forth by our Supreme Court in Great American Reserve Ins. Co. v. San Antonio Plumbing Supply Co., 391 S.W.2d 41 (1965).

We have given the appellants the benefit of each of these rules of judicial review and we have also indulged with great liberality every inference and doubt in favor of appellants in attempting to pass upon their first point of error, which is too general and completely fails to point to any issue of fact presented in the record. While we believe, as hereinabove pointed out, that appellants have misconceived the law with reference to judicial review of summary judgments yet we have, in the spirit of liberal construction, examined carefully all of the summary judgment evidence before us in an effort to ascertain whether such summary judgment evidence, as opposed to the pleadings, does present questions of fact which should have been

determined by a court or a jury. Having done so we find, and so hold, that appellee did sustain his burden of proof by demonstrating, through the medium of summary judgment evidence, that no issue of fact was presented and therefore the trial court was correct in sustaining his motion for summary judgment.

When we examine the alleged defamatory statements in the framework of Mrs. Arant's own testimony, and viewing the same most favorably to her, we arrive at the conclusion that the words complained about are not actionable either per se or per quod. It is, of course, the law that defamatory language may be actionable per se, that is, in itself, or may be actionable per quod, that is, only on allegation and proof of special damages. The distinction is based on a rule of evidence, the difference between them lying in the proof of the resulting injury. 36 Tex.Jur. 2d, Libel and Slander, § 2, pp. 280–281.

The law recognizes the distinction between oral and written imputations.

"In general, oral words, however opprobrious, are not actionable without proof of special damage, unless they impute to another the commission of a crime or affect a person injuriously in his office, profession or occupation. Written or printed words charging dishonesty, fraud, rascality, or general depravity are generally libelous per se, but not so when spoken orally." 36 Tex.Jur.2d, Libel and Slander, § 3, pp. 282–283.

Appellants, in their brief, acknowledge the validity of these rules and concede that the words used by appellee were not actionable per se. They recognize the case of Billington v. Houston Fire & Casualty Ins. Co., 226 S.W.2d 494 (Tex.Civ.App., Fort Worth 1950, mandamus overruled), which holds specifically that defamatory words such as "liar" and "crook" are not actionable per se. In an effort to avoid the effect of the law mentioned above appellants seek to extend and expand the meaning of the words used by appellee by pleading innuendo.

They claim that appellee's designation of Mrs. Arant as a "phony", "cheat", and "crook", meant that Mrs. Arant was a thief. They say:

"Appellants allege that, under the circumstances plead regarding the home furnishings sale, and the place and manner in which the words were published, Appellee implied and meant thereby that Appellant Lylla Arant was committing the crime of theft, and, in the second publication, that Appellant Lylla Arant was a thief."

They also say that the words implied that Mrs. Arant was cheating her customers in the home furnishings sale. A review of the summary judgment facts, as opposed to the pleadings, reveals that appellants have not substantiated their allegation by proof.

It is the function of innuendo to explain, but not extend, the effect and meaning of language used which is charged to be libelous. Snider v. Leatherwood, 49 S.W.2d 1107 (Tex.Civ.App., Eastland 1932, writ dism'd). In order to give a defamatory meaning words which would not otherwise be actionable, the words used must be capable of a defamatory construction, and the test is what construction would be placed upon such language by the average person or the general public, and not by appellants. Skillern v. Brookshire, 58 S.W.2d 544 (Tex.Civ.App., Beaumont 1933, no writ). It is the duty of the court to determine if published words are capable of the meaning ascribed to them by the alleged innuendo, and if in their natural meaning they are incapable of such interpretation, it is the duty of the court to withhold the case from the jury. Express Publishing Co. v. Southwell, 295 S.W. 180 (Tex.Civ.App., San Antonio 1927, writ ref'd).

In the case of Skillern v. Brookshire, supra, the defendant store manager accosted the plaintiff, a customer in the store, and accused him of having taken some sugar from the store without paying

for it. The court there held that there was no issuable fact created for the jury and that the words used amounted to nothing more than a charge that the plaintiff was *trying* to steal the sugar, and therefore not actionable. In so holding, the court stated that it considered the defendant's words equivalent to a charge of "cheating", "dishonesty", and "lying". The court said that oral words charging cheating, dishonesty and lying are not actionable unless they impute to the plaintiff a crime at common law or under a statute. The court concluded that the defendant had not slandered the plaintiff, as a matter of law. We think this decision controls the facts before us. While the appellants do plead the innuendo, or the claim that the words spoken impute the commission of a crime, namely, theft, such innuendo does not have a reasonable basis in the evidence. Perry v. Donaho, 358 S.W.2d 253 (Tex.Civ.App., Eastland 1962, no writ). When we review the words spoken, in the light of the circumstances described by Mrs. Arant, we cannot conclude that the words intended to convey the idea that Mrs. Arant had been guilty of the commission of a crime, namely, theft. According to Mrs. Arant's own testimony appellee had telephoned her and demanded the she cease her activities on the premises and remove her property therefrom, mainly because he had found an automobile setting in the middle of his lawn. According to Mrs. Arant the words in question were used by appellee immediately upon his arrival at the premises or following the telephone conversation, and that such words neither preceded nor were followed by any discussion directly or indirectly of whether or not Mrs. Arant was cheating her customers. To the contrary, the words were spoken only in the context of appellee insisting that Mrs. Arant stop the sale, remove belongings from the premises and leave by midnight. Mrs. Arant admitted that appellee had been very friendly prior to his demand and that when she agreed to leave he became friendly again. The only conclusion to be reached is that appellee was concerned only with getting the sale stopped and the merchandise removed from his premises. There is nothing in this record to show any concern on appellee's part with whether or not Mrs. Arant's customers were being cheated or whether Mrs. Arant had stolen anything.

In McCauley v. State, 64 Tex.Cr.R. 183, 141 S.W. 975 (1911), the court, in discussing innuendo, said:

"If the words before the innuendo do not sound in slander, no meaning produced by the innuendo will make the action maintainable, for it is not the nature of an innuendo to beget an action. * * * The business of an innuendo is, *by a reference to preceding matter,* to fix more precisely the meaning. *The office of an innuendo is to explain, not to extend, what has gone before, and it cannot enlarge the meaning of words, unless it be connected with some matter of fact expressly averred."* (Emphasis supplied.)

We agree with appellee that an innuendo cannot make certain that which is not certain before, and the facts and circumstances must be such that the truth of the innuendo can be reasonably inferred therefrom. Harris v. Santa Fe Townsite Co., 58 Tex.Civ.App. 506, 125 S.W. 77 (1910, writ ref'd).

Neither can it be reasonably said that the quoted words uttered by appellee injuriously affected Mrs. Arant in her business, office or occupation, since she affirmatively denied having such business or occupation. She stated positively that the sales she was holding were for "fun" and as a "hobby". This phase of the case is discussed by the court in Buck v. Savage, 323 S.W.2d 363 (Tex.Civ.App., Houston 1959, writ ref'd n. r. e.).

It is the province of the court to determine what constitutes defamation. Pridemore v. San Angelo Standard, 146 S.W.2d 1048 (Tex.Civ.App., Beaumont 1941, writ dism'd judgmt cor.); Summers v. W. T. Grant Co., 178 F.2d 916 (5th Cir. 1950). We hold that the record before us demon-

strates, as a matter of law, that the words used by appellee under the circumstances revealed by the record are not actionable, as a matter of law.

We also believe that the record affirmatively demonstrates that appellee's communication was clothed with privilege. Admittedly, neither Mrs. Lively nor Mrs. Arant had any title to the premises in question after April 6, 1965 and Mrs. Lively remained upon the premises solely at the sufferance of appellee. She was nothing more than a mere licensee. A license in real property is a privilege or authority given to a person, or retained by a person, to do some act or acts on the land of another but such license conveys no interest in, or title to, the property concerned. 36 Tex.Jur.2d, Licenses, § 84, p. 671. Mrs. Arant, not being privy to the privilege extended by appellee to Mrs. Lively, held no greater rights than Mrs. Lively. The undisputed facts show conclusively that appellee revoked any license or implied consent to use the premises when he telephoned Mrs. Arant shortly prior to noon on Friday, April 30, 1965. Since the license was not supported by consideration it is revocable at the will of the grantor. Drye v. Eagle Rock Ranch, Inc., 364 S.W. 2d 196 (Tex.Sup.1963); Thomas v. Junction City Irrigation Co., 80 Tex. 550, 16 S.W. 324 (1891); City of Austin v. Puett, 344 S.W.2d 717 (Tex.Civ.App., Austin 1961, writ ref'd n. r. e.). Following the revocation of license Mrs. Arant became a trespasser by virtue of her refusal to stop the sale when ordered to do so. Loftus v. Maxey, 73 Tex. 242, 11 S.W. 272 (1889). Since Mrs. Arant occupied an unlawful status on appellee's premises he was justified in using whatever force was necessary to remove her and her associates by virtue of the provisions of Art. 1142 of the Texas Penal Code, which justifies violence "in preventing or interrupting an intrusion upon the lawful possession of property." While Mr. Jaffe did not resort to violence we find and hold that he had the right to halt Mrs. Arant's activities.

In Perry Bros. Variety Stores v. Layton, 119 Tex. 130, 25 S.W.2d 310 (Tex.Comm. App.1930), the existence or nonexistence of privilege, either absolute or qualified, was held to be a question of law for the court. The court said:

"It is settled in this state that a communication made in good faith, in reference to a matter in which the person communicating has an interest, is privileged, if made to another for the purpose of protecting that interest, * * *."

See also International & G.N. Ry. Co. v. Edmundson, 222 S.W. 181 (Tex.Comm.App. 1920); Browning v. Gomez, 332 S.W.2d 588 (Tex.Civ.App., Austin 1960, no writ).

Under the circumstances here presented appellee was discharging a "private duty in the conduct of his own affairs" so that everyone who is trespassing on his property, or is there at the trespasser's invitation, has a "corresponding duty or interest to receive" his communications in connection therewith. The communication in this instance was qualifiedly privileged. Laughlin v. Schnitzer, 106 S.W. 908 (Tex. Civ.App.1908, no writ); Lyle v. Waddle, 144 Tex. 90, 188 S.W.2d 770 (1945).

Appellants seek to take the position that their pleadings present the issue of malice. Such contention is entirely without merit for several reasons. In the first place, where the language complained about is shown to have been privileged the burden shifts to the plaintiffs to make the additional proof that the spoken words were uttered through express malice. Caruth v. Dallas Gas Co., 282 S.W. 334 (Tex.Civ. App., Dallas 1926, no writ). By the showing of a qualified privilege, any presumption of malice or want of good faith actuating the communication is negated, thereby shifting the burden to plaintiffs to show actual malice. Dealers National Ins. Co. v. Rose, 396 S.W.2d 535 (Tex.Civ. App., Waco 1965, no writ); International & G.N. Ry. Co. v. Edmundson, 222 S.W. 181 (Tex.Comm.App.1920); and First Texas Prudential Ins. Co. v. Moreland, 55 S.W.

2d 616 (Tex.Civ.App., Beaumont 1932, writ dism'd). Thus, mere pleadings are wholly insufficient to rebut the presumption of good faith occasioned by appellee's qualified privilege, or to defeat appellee's motion for summary judgment. In addition to the question of privilege, we find no evidence in the record to support the alleged malice on the part of Jaffe.

Appellants' Points 2, 3, 4 and 5 all deal with the question of the alleged sufficiency of appellants' pleadings. Again, we emphasize that the disposition of appellee's motion for summary judgment was made based upon the summary judgment evidence, and not the pleadings. The points are without merit.

We have carefully considered all of appellants' points of error and finding the same to reflect no reversible error the judgment of the trial court is

Affirmed.