TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-98-00648-CV






S&T Aircraft Accessories, Inc. and Mary Turner, Appellants



v.



Ben Bonnington, Appellee






FROM THE DISTRICT COURT OF COMAL COUNTY, 207TH JUDICIAL DISTRICT


NO. C96-0781B, HONORABLE CHARLES RAMSAY, JUDGE PRESIDING 







 Appellants S&T Aircraft Accessories, Inc. and Mary Turner appeal from the trial
court's judgment rendered in conformance with the jury's findings that they slandered and
intentionally inflicted severe emotional distress on appellee Ben Bonnington. We will affirm in
part and reverse and render in part.

Background

 Turner is president of S&T; Bonnington worked at S&T from September 1995
through early December 1995. Bonnington left S&T in December and has since returned to his
home in Arizona. In October 1996, Bonnington sued S&T and Turner, claiming Turner had
slandered him to S&T employees and people unrelated to S&T, intentionally causing him to suffer
emotional distress, and that S&T and Turner had breached his employment contract. Bonnington
sued Turner in her individual capacity and S&T as principal for Turner, its agent. The jury found
in favor of Bonnington on his defamation and intentional infliction of emotional distress claims,
awarding him actual damages for slander in the amounts of $39,800 from Turner and $74,800
from S&T, plus actual damages for emotional distress in the amounts of $30,000 from Turner and
$30,000 from S&T. The jury also assessed punitive damages of $50,000 against Turner and
$125,000 against S&T. The trial court awarded Bonnington total damages of $349,600 on the
jury verdict. 

 S&T and Turner challenge the sufficiency of the evidence supporting the jury's
findings that they slandered Bonnington, acted toward him with malice, or intentionally inflicted
emotional distress on him. They argue there is no evidence or insufficient evidence to support
the jury's awards of actual and punitive damages, or in the alternative that the damage awards are
excessive. Turner and S&T claim the trial court erred in not granting them a new trial because
(1) the damages constitute double recovery, (2) they were improperly denied separate punitive
damage questions, and (3) they were improperly denied a jury instruction. 


Standard of Review

 In reviewing a "no-evidence" challenge to a jury finding, we consider the evidence
in the light most favorable to the finding, indulging all reasonable inferences in favor of the
finding and disregarding contrary evidence and inferences. See Leitch v. Hornsby, 935 S.W.2d
114, 118 (Tex. 1996); ONI, Inc. v. Swift, 990 S.W.2d 500, 502 (Tex. App.--Austin 1999, no
pet.). If there is more than a scintilla of evidence to support a finding, we will overrule the legal
sufficiency challenge. See Leitch, 935 S.W.2d at 118; Swift, 990 S.W.2d at 502. In reviewing
the factual sufficiency of the evidence, we consider and weigh all of the evidence and set aside
the finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly
wrong and unjust. See Maritime Overseas Corp. v. Ellis, 971 S.W.2d 402, 406-407 (Tex. 1998);
Swift, 990 S.W.2d at 502. A claim of excessive damages challenges the factual sufficiency of the
evidence. See Ellis, 971 S.W.2d at 406.


Summary of the Evidence

 In order to consider the sufficiency of the evidence, we will give a detailed
summary of the testimony. Turner's late husband, Orville Turner, owned and ran S&T. In July
1995, he asked Bonnington, his longtime friend, if he would move from Arizona to New
Braunfels to take charge of S&T's back shop. Bonnington testified Orville Turner said this job
would be a "lifetime" job from which Bonnington could retire and take it easy, and they agreed
Bonnington's salary would be $400 a week. Bonnington claimed his salary was to increase to
$500 a week when his wife retired and moved to Texas. Orville Turner denied agreeing to
increase Bonnington's salary. There was no written agreement between Bonnington and Orville
Turner setting out the terms of Bonnington's employment. Bonnington and the Turners agreed
that Bonnington would live with the Turners until his wife arrived. Orville Turner gave
Bonnington a check for $5,500 to wrap up his business in Arizona, and in August 1995
Bonnington moved to New Braunfels. Orville Turner introduced Bonnington to S&T's employees
by saying Bonnington would answer directly to Orville Turner. 

 In late September 1995, Orville Turner's health deteriorated, requiring him to
undergo triple heart-bypass surgery. Mary Turner asked Bonnington to move out of the house
because relatives were coming to stay while Orville Turner had surgery. As he was packing,
Bonnington took one of the Turners' ashtrays and wrapped it in his dirty laundry, intending to
take it to his apartment. (1) Bonnington testified that he decided to ask Turner before taking the
ashtray, so he left it in his laundry on the bed in the Turners' guest room while he drove some
other belongings to his apartment. When he returned, Turner confronted him with the ashtray,
yelled that he was a thief, and asked how he could do such a thing to Orville Turner. Bonnington
tried to explain that he was going to ask her before taking it, but she did not believe him. 
Bonnington offered to buy Turner new ashtrays, but she said, "I don't want anything to do with
you."

 Through the fall of 1995, Orville Turner was in and out of the hospital, leaving
Mary Turner in charge of S&T. Bonnington learned that Turner was telling S&T employees and
others that he was a liar and a thief, and that he had stolen glasses and silverware from her home. 
Bonnington denied taking anything from the Turners' home or from S&T. 

 Bonnington's working relationship with Mary Turner continued to deteriorate
throughout October, November, and December. He testified she constantly belittled him by not
consulting with him about S&T decisions and by making it clear that she was the boss at S&T and
that Bonnington had no real authority. She constantly inspected his work and made it company
policy that no one was to inspect anything without her or her son's approval. Bonnington
complained that Turner brought customers into the shop and introduced them to everyone except
him. He said she demoralized the people he was supposed to manage in the back shop. 
Bonnington said Turner made accusations that inventory was missing from S&T; when asked if
she accused him, he answered, "Yeah, in a way." Bonnington complained that before the ashtray
incident, Turner had confronted him for coming back to work late after lunch. Turner confronted
him about making personal calls on S&T's telephone, but he said he had Orville Turner's
approval. Bonnington paid S&T for some of his personal calls, but did not reimburse S&T for
all his long distance calls. Bonnington complained that Turner never asked if she could help in
the back shop, but instead came into S&T and took over. Bonnington admitted that he blew up
at Turner and that they had a screaming match at S&T.

 Laura Robinson, a former S&T employee, testified that the back shop employees
were to report to Bonnington and he was to report to Orville Turner. She frequently heard Turner
call Bonnington a thief and a liar, and Turner told her Bonnington had stolen the Turners'
ashtrays. Robinson testified that Turner said something to the effect that Bonnington was taking
things out the back door of S&T and that items were missing from inventory. Turner never told
Robinson that Bonnington had taken household items other than the ashtrays, but Robinson heard
it rumored around the office. Robinson knew Bonnington was authorized by Orville Turner to
make personal calls, and said Turner constantly checked his calls and complained that he used
S&T's telephone for personal long distance calls. Robinson said Turner became "nitpicky" and
seemed to look for Bonnington's mistakes. Robinson testified that she believed Bonnington was
an honest person of integrity and said Turner's accusations did not change that impression. 

 Buster Bowers, another former S&T employee, understood Bonnington was to run
the back shop and report to Turner and Orville Turner. Bowers said Bonnington was harassed
and made unhappy by Turner and got no cooperation from the front office. Justin Grudzinski,
Turner's son-in-law and a former S&T employee, worked at S&T when Bonnington arrived. 
Grudzinski left S&T because he did not like the way things were run by Turner and her son. He
did not get along with Turner and did not like her criticism. He said there was hostility between
Bonnington and Turner and that Turner expressed it by undermining Bonnington's work, being
rude, and walking away in the middle of confrontations. Grudzinski said Bonnington tried to do
his job but that Bonnington had confrontations with Turner three or four times a week. 
Grudzinski heard Turner say Bonnington had stolen ashtrays and he thought she said Bonnington
stole silverware and glasses as well. He recalled Turner saying she wanted a lock on S&T's
stockroom because Bonnington was working there and things were missing. Grudzinski recalled
a Board of Directors meeting during which Turner said Bonnington had stolen from S&T and that
she wanted him to leave the company. Grudzinski heard Bonnington tell another employee that
if Turner had treated Bonnington the way she treated the employee, Bonnington would have hit
her. Turner's claims did not change Grudzinski's opinion about Bonnington's honesty. 

 Turner testified that Bonnington took an ashtray from her sewing machine, and she
found it wrapped in his laundry when she stripped the bed to change the sheets. She said two
other ashtrays were missing from her house after Bonnington left. Turner denied saying
Bonnington had stolen anything other than ashtrays from her house, but repeatedly said she
believed he had stolen the ashtrays. She admitted calling Bonnington a liar and a thief. She
denied accusing him of stealing S&T inventory; she said she tried to find inventory when she
discovered it was missing. She was asked repeatedly about her opinion of Bonnington and
reiterated that he was a liar and a thief. Turner considered him a thief because he took from her
house two ashtrays and almost took a third, and a liar because he lied about it when confronted. 
She said she would take that conviction to her grave: Turner stated, "I know what he did and he
is a liar and he is a thief." 

 Turner could not estimate how many S&T employees she told about Bonnington's
taking the ashtrays. She remembered complaining about him to five people outside of S&T, all
of whom were family members or close personal friends, and said the subject came up in
conversation while she was upset and frightened about Orville Turner's poor health. Turner could
not remember if she had told anyone else outside of S&T. 

 Turner said during the fall of 1995 she was very upset because she was trying to
run S&T and Orville Turner was so sick. She said she liked Bonnington at first, but decided she
wanted him out of S&T when he stole her ashtrays. She testified that when Orville Turner
became sick she made a point of telling the employees she was in charge of S&T. Turner
admitted using foul language at S&T on occasion. She denied being nasty to Bonnington at work,
but admitted calling him names and said he called her names. She testified she only wanted
Bonnington to do his job, rather than sitting in his office reading a newspaper. She thought all
of S&T heard the fight in which she and Bonnington yelled at each other and she called him a liar
and a thief. 

 Orville Turner died before trial. In deposition testimony read into evidence,
Orville Turner said he brought Bonnington to S&T because Grudzinski, who had been running
the back shop, was not doing a good job and was not honest. He thought Grudzinski had taken
money from S&T. Orville Turner did not think Bonnington had performed the work for which
he had been hired, and said Bonnington left S&T before Orville Turner could talk to him about
it. Orville Turner gave Bonnington permission to call his wife on the company telephone with
the understanding that Bonnington would check with Orville Turner before making any calls. 
Bonnington once told Orville Turner that he was using his personal credit card for a call, when
in fact he had charged it to S&T. Orville Turner said Bonnington ran the back shop, and Mary
Turner ran S&T overall, including the back shop. Orville Turner used to think Bonnington was
honest, but Bonnington's court filings and deposition testimony contained statements Orville
Turner knew were untrue. Orville Turner never heard his wife claim Bonnington had stolen
anything other than ashtrays. 

 Jenette Wirtz, a long-time S&T employee, testified that Bonnington said Turner
accused him of stealing ashtrays. She heard about the dispute from other S&T employees. 
Bonnington complained to Wirtz about S&T's policies, saying the employees should all walk out
on S&T to force a change in company policies. He also gave S&T's employees an attorney's card
and suggested that they file a harassment suit against the company. Bonnington told Wirtz to
ignore Mary Turner because she was not Wirtz's boss. On Bonnington's urging, Wirtz wrote a
letter complaining about working conditions and morale because Bonnington said it would help
the lawsuit and because she thought she was going to be fired. Wirtz no longer believed the
things she had written in her letter, but at the time she wrote them, Grudzinski and Bonnington
had convinced her that people were being harassed. Bonnington told Wirtz that if she assaulted
Mary Turner, he and Grudzinski would bail her out of jail. 

Emotional Distress

 S&T and Turner claim the evidence is legally and factually insufficient to support
the jury's finding of intentional infliction of emotional distress. We agree.

 To recover for intentional infliction of emotional distress, a plaintiff must prove
(1) the defendant acted intentionally or recklessly, (2) the conduct was extreme and outrageous,
and (3) the conduct caused the plaintiff severe emotional distress. See GTE Southwest, Inc. v.
Bruce, 998 S.W.2d 605, 611 (Tex. 1999). Conduct is extreme and outrageous if it goes beyond
all bounds of decency and is atrocious and intolerable in a civilized society. See id. Insensitivity,
rudeness, and minor insults, indignities, threats, annoyances, and petty oppressions generally are
not extreme and outrageous behavior. See id. at 612. Whether a defendant's conduct was so
outrageous and extreme as to constitute intentional infliction of emotional distress is a question
of law for the trial court. See Wornick Co. v. Casas, 856 S.W.2d 732, 734 (Tex. 1993). 

 Intentional infliction of emotional distress claims arising out of the workplace are
subject to strict review in Texas. See Bruce, 998 S.W.2d at 612. Texas courts allow employers
great latitude in supervising, criticizing, disciplining, and discharging employees. See id. A
claim for intentional infliction of emotional distress will not lie for ordinary employment disputes,
even if the behavior is unpleasant or unfair. See id. at 613. Conduct in the workplace that will
give rise to such a claim "exists only in the most unusual of circumstances." Id. Most
workplace-related claims of intentional infliction of emotional distress fail. See Horton v.
Montgomery Ward & Co., 827 S.W.2d 361, 369 (Tex. App.--San Antonio 1992, writ denied). (2) 
Falsely depicting in the community that an employee is a thief is not sufficiently outrageous
conduct to support such a claim. See Diamond Shamrock Ref. & Mktg. Co. v. Mendez, 844
S.W.2d 198, 202 (Tex. 1992).

 The behavior of which Bonnington complains--Turner's calling him a thief and a
liar, undermining his authority and the shop's productivity, saying she was in charge, not
consulting with Bonnington, inspecting his work, not introducing clients to Bonnington, making
innuendos about missing inventory, confronting him about a long lunch, and complaining about
his charging S&T's telephone for personal phone calls--is rude and insensitive, and Bonnington
appears to have responded in kind. Turner dislikes Bonnington and holds him in very low regard. 
However, her behavior did not exceed all bounds of decency and civilized behavior. See Bruce,
998 S.W.2d at 611; Mendez, 844 S.W.2d at 202. We hold that Turner's behavior was not so
outrageous and extreme as to constitute intentional infliction of emotional distress. We reverse
the portion of the judgment awarding Bonnington damages for emotional distress.


Slander

 Slander is a defamatory statement orally communicated to a third person without
a legal excuse. See Randall's Food Markets, Inc. v. Johnson, 891 S.W.2d 640, 646 (Tex. 1995). 
A statement is defamatory if it tends to impeach the subject's honesty, integrity, or otherwise
injure his reputation, exposing him to financial injury or public hatred, contempt, or ridicule. See
Abbott v. Pollock, 946 S.W.2d 513, 519 (Tex. App.--Austin 1997, writ denied). Truth is a
defense to a defamation suit brought by private individuals. See Johnson, 891 S.W.2d at 646. 

 Generally, oral defamatory statements are not actionable without proof of actual
damages. See Einhorn v. LaChance, 823 S.W.2d 405, 411 (Tex. App.--Houston [1st Dist.] 1992,
writ dism'd w.o.j.); Arant v. Jaffe, 436 S.W.2d 169, 176 (Tex. Civ. App.--Dallas 1968, no writ). 
However, some statements are presumed to harm the subject's reputation and do not require proof
of injury; such statements are slanderous per se. See Shearson Lehman Hutton, Inc. v. Tucker,
806 S.W.2d 914, 921 (Tex. App.--Corpus Christi 1991, writ dism'd w.o.j.). An oral statement
that falsely and unambiguously charges a person with criminal conduct is slanderous per se, as
is a statement that injures him in his profession or occupation. See id.; Gray v. HEB Food Stores
No. 4, 941 S.W.2d 327, 329 (Tex. App.--Corpus Christi 1997, writ denied). Calling someone a
liar usually is not considered slanderous per se, but falsely calling him a "thief" may be. See
Bennett v. Computer Assocs. Int'l, Inc., 932 S.W.2d 197, 200 (Tex. App.--Amarillo 1996, writ
denied); Arant, 436 S.W.2d at 176; 50 Tex. Jur. 3d Libel and Slander §§ 16, 21 (1986). 

 If a plaintiff proves slander per se, actual damages are presumed and the jury has
discretion to estimate damages suffered by the plaintiff. See Wal-Mart Stores, Inc. v. Odem, 929
S.W.2d 513, 527 (Tex. App.--San Antonio 1996, writ denied). In such a case, we will not disturb
a jury's award of actual damages unless the record indicates the award was excessive or the result
of passion, prejudice, or other improper influence. See id. 


I. Opinion versus factual assertion

 S&T and Turner claim her statements are entitled to absolute privilege because they
were statements of opinion and not assertions of fact. We disagree. 

 The Supreme Court has explicitly held that opinion speech is not entitled to a
separate constitutional privilege. (3) See Milkovich v. Lorain Journal Co., 497 U.S. 1, 21 (1990). 
Simply saying "I think" or "in my opinion" before labeling someone a thief does not dispel the
harmful implication that the speaker knows for a fact that the accused has stolen. See id. at 18-19. 
Even if a speaker explains why she believes the subject is a liar, if the facts are incorrect or
incomplete, the statement may still imply a false assertion of fact. See id. Defaming someone
can harm his reputation whether or not the accusation is premised with "I think." See id. at 19.

 We hold Turner's statements about Bonnington were not entitled to any absolute
privilege, whether viewed as factual assertions or opinions. Nor are the statements made non-defamatory because they arose out of the alleged theft of valueless ashtrays.


II. Qualified privilege

 Turner and S&T argue her allegations are protected by qualified privilege. We
hold that even if some of her statements are protected by qualified privilege, many of them are
not.

 A communication is subject to qualified privilege if it is made in good faith on a
subject in which the speaker has an interest or duty to another person having a corresponding
interest or duty. See Martin v. Southwestern Elec. Power Co., 860 S.W.2d 197, 199 (Tex.
App.--Texarkana 1993, writ denied); 50 Tex. Jur. 3d Libel and Slander § 54 (1986). Such
privilege is particularly applicable to communications between employers and employees. See
Martin, 860 S.W.2d at 199. Employer communications about employee wrongdoing are
privileged if the communications are made to those having an interest in the matter. See Johnson,
891 S.W.2d at 646. Whether a communication is privileged is a question of law. See Dixon v.
Southwestern Bell Tel. Co., 607 S.W.2d 240, 241 (Tex. 1980). The jury resolves disputes about
the circumstances under which the statement was made. See id. at 242. 

 In this case, statements Turner may have made to S&T employees about missing
inventory, particulary remarks made at the board meeting, arguably are privileged. S&T is a
relatively small company, and its employees arguably are interested in protecting it from loss due
to theft. If Turner was concerned about missing inventory and doubted Bonnington's honesty, her
remarks connecting the missing inventory to Bonnington's presence arguably are protected by
privilege. However, even if we hold her remarks about missing inventory are privileged, the
jury's finding that she and S&T slandered Bonnington may still stand because her remarks went
far beyond matters in which S&T employees had an interest. We doubt that her shouting matches
calling Bonnington a liar and a thief were intended as communications to S&T employees with
an interest in preserving inventory. Likewise, her remarks made to people unconnected to S&T
are not privileged. Turner and S&T do not attempt to argue that all of her statements were
privileged, instead arguing that some or most of them were. Turner's statements about inventory
may have been privileged, but we overrule Turner and S&T's claim that privilege attached to
enough of her remarks to defeat Bonnington's defamation claim as a whole. 


III. Substantial truth 

 Turner and S&T claim her statements were substantially true, thus defeating
Bonnington's defamation claim. We disagree. 

 A finding of "substantial truth" defeats a defamation claim and entitles a defendant
to judgment. See McIlvain v. Jacobs, 794 S.W.2d 14, 15 (Tex. 1990). In determining whether
a statement is substantially true, the fact-finder considers whether the statement is more damaging
to the plaintiff's reputation in the mind of an average listener than a factually true and complete
statement would have been. See id. at 16. 

 Turner and S&T claim Bonnington's admission that he was going to take the
ashtray makes her other claims substantially true because her accusations were only marginally
worse than the facts to which he admitted. They also claim Bonnington's testimony that if he ever
took anything from S&T it would have been a small item is equivalent to Turner's accusations,
making her claims substantially true. (4) The jury was instructed on the defense of substantial truth
and found Turner's statements were not substantially true; that finding is not against the great
weight and preponderance of the evidence. We cannot say as a matter of law that Turner's
accusations were no more damaging to Bonnington's reputation that the facts to which he admits. 
We overrule S&T and Turner's argument that her allegations were substantially true.


IV. Did Turner and S&T defame Bonnington?

 Having overruled Turner and S&T's claims that her statements were privileged or
substantially true, we hold the jury's findings that S&T and Turner defamed Bonnington are
supported by legally and factually sufficient evidence. We affirm the trial court's judgment
finding Turner and S&T defamed Bonnington.

Actual Damages

 Turner and S&T argue the jury's award of actual damages is unsupported by the
evidence or, alternatively, excessive. After examining the damages the jury awarded for
Bonnington's defamation claim, we agree in part. 

 Assessing damages for slander, the jury awarded $15,000 against Turner for
shame, humiliation, and mental anguish in the past, $15,000 for injury to Bonnington's reputation
and character in the past, $5,000 for injury to his reputation and character in the future, and
$4,800 for loss of earnings in the past. The jury assessed damages of $30,000 against S&T for
shame, humiliation, and mental anguish in the past, $30,000 for injury to Bonnington's reputation
and character in the past, $10,000 for injury to his reputation and character in the future, and
$4,800 for loss of earnings in the past. 

 Turner's statements that Bonnington was a thief can be considered slanderous per
se; damages to his reputation are presumed and need not be proven. It is for the jury to determine
the extent of the damage. See Odem, 929 S.W.2d at 527. Defamation damages are purely
personal and cannot be set by a fixed rule. See id. We will not disturb the jury's award of actual
damages unless we find the award was excessive or the result of an improper influence. See id. 
There is no evidence of improper influence in this record, and the difficulty of standardizing
defamation damages impels us to uphold the jury's assessment of damage to Bonnington's
reputation and for shame and mental anguish. However, we take issue with the jury's assessment
of $9,600 in total lost wages. There is no testimony or other evidence in the record indicating
Bonnington was unable to find other work due to Turner's allegations. The only testimony on the
record about wages or other employment is that Bonnington said he took a job checking credit
statements for a financing company starting in April or May 1997, earning from $500 to $1,000
a month. Bonnington did not testify that he had been unable to find work for 16 or 17 months
after leaving S&T, nor did he testify that his earning capacity was diminished by Turner's
statements. He did not testify that anyone outside of New Braunfels had ever heard Turner's
slanderous allegations. He did not testify that Turner's slander had in any way affected his
employability in Arizona. 

 Further, the jury found there was no breach of an employment contract by either
Bonnington or S&T. Bonnington believed Orville Turner's statement that the back shop was not
working indicated he was out of a job. Other witnesses and evidence indicated Bonnington's
decision to leave was mutual. There was no written contract governing the terms of his
employment. Texas is an employment-at-will state and Bonnington has not shown he is entitled
to lost wages. See Town of S. Padre Island v. Jacobs, 736 S.W.2d 134, 138 (Tex. App.--Corpus
Christi 1986, writ denied). We find no evidence in the record to support an award for lost wages. 
We reverse the trial court's award of $9,600 in lost wages. 


Punitive Damages

 Turner and S&T argue the jury's award of punitive damages is unsupported by the
evidence. We agree. Having held that Bonnington's intentional infliction of emotional distress
claim must fail, the only cause of action under which he may recover punitive damages is his
defamation claim. Exemplary or punitive damages in a defamation case require a finding of actual
malice. See Leyendecker & Assocs., Inc. v. Wechter, 683 S.W.2d 369, 375 (Tex. 1984). The
jury's findings that Turner and S&T acted with actual malice are not supported by the record.

 "Actual malice" is a term of art that differs from the everyday concept of common
law malice; it does not mean mere ill will, spite, or evil motive. See Hagler v. Proctor & Gamble
Mfg. Co., 884 S.W.2d 771, 771 (Tex. 1994). A finding of actual malice requires proof that the
defendant knew her statements were false or recklessly disregarded the truth of her statements,
meaning she entertained serious doubts about the truth of her words; mere suspicion or surmise
is not enough to support such a finding. See id. at 771-72; Dolcefino v. Turner, 987 S.W.2d 100,
112 (Tex. App.--Houston [14th Dist.] 1998, pet. filed). Negligence, failure to investigate the truth
of one's words, or failure to act as a reasonably prudent person does not constitute actual malice. 
See St. Amant v. Thompson, 390 U.S. 727, 733 (1968); Tucker, 806 S.W.2d at 924. 

 The plaintiff may show actual malice through circumstantial evidence, but showing
a "[d]ifference of opinion as to the truth of a matter -- even a difference of 12 to 1 -- does not alone
constitute clear and convincing evidence that the defendant acted with a knowledge of falsity or
with a 'high degree of awareness of . . . probable falsity.'" Harte-Hanks Communications, Inc.
v. Connaughton, 491 U.S. 657, 681 (1989). In other words, Bonnington cannot prove Turner
acted with actual malice by providing testimony that those who heard her accusations of
dishonesty did not believe them. Actual malice may be inferred from circumstantial evidence, but
we must be careful not to place too much reliance on such evidence. See id. at 668; Wechter, 683
S.W.2d at 275 It is not enough for the jury to disbelieve the defendant's testimony; the plaintiff
must produce clear and convincing evidence that the defendant, at a minimum, entertained serious
doubts about the truth of her claims. See Odem, 929 S.W.2d at 525-26; Dolcefino, 987 S.W.2d
at 112.

 While we agree there certainly is evidence of ill will between Turner and
Bonnington, we do not find in this record evidence that Turner acted with actual malice toward
Bonnington. Her testimony and the testimony of those who heard her accusations indicate she
fervently believed Bonnington had stolen two ashtrays from her home, would have stolen a third
had he not been caught, and lied about the thefts when confronted. It is not enough that Turner
admittedly bears Bonnington ill will. Although Turner may have been mistaken in her beliefs,
the circumstances and the manner in which her statements were made do not lead to an inference
that Turner knew or had a high degree of awareness that Bonnington had not taken any ashtrays
and was not a thief or a liar. We hold there was no more than a scintilla of evidence to support
the jury's finding of actual malice. Without actual malice, an award of punitive damages cannot
stand. 

 We reverse the trial court's judgment that finds Turner and S&T acted with actual
malice in defaming Bonnington. Because no grounds support such an award, we reverse the
award of punitive damages to Bonnington.


Jury Instruction

 S&T and Turner claim they were erroneously denied a jury instruction on scope
of employment because Bonnington alleged slanderous statements were made to people outside
S&T. S&T and Turner argue the omission of their requested instruction may have misled the jury
into finding S&T liable for statements made outside the course and scope of Turner's association
with S&T. We disagree and will overrule their argument on appeal.

 We review jury charge error under an abuse of discretion standard. See Texas
Dep't of Human Servs. v. E.B., 802 S.W.2d 647, 649 (Tex. 1990); Texas Dep't of Human Servs.
v. Green, 855 S.W.2d 136, 151 (Tex. App.--Austin 1993, writ denied). A party complaining on
appeal of the omission of a requested jury instruction must have submitted to the trial court a
substantially correct instruction. See Tex. R. Civ. P. 278 (emphasis added).

 S&T and Turner requested the inclusion in the charge of an instruction on the scope
of employment that read as follows: 


You are instructed that an employee acts as the agent of Defendant in making a
statement, if making the statement is within the scope of the general authority
given to the employee by Defendant. Furthermore, the acts complained of must
have been performed in the furtherance of the business of Defendant, and the acts
must have been performed to accomplish the job for which the employee was
employed. 



 Turner was not an ordinary employee of S&T; she was a "vice principal" and her
acts are considered the acts of S&T itself. See Hammerly Oaks, Inc. v. Edwards, 958 S.W.2d
387, 391 (Tex. 1997). A vice principal is one of four kinds of corporate agents: a corporate
officer; someone with authority to employ, discharge, or direct employees; someone responsible
for non-delegable or absolute duties of the corporation; or someone responsible for the
management of the whole or a department or division of the corporation. See id. As acting
president, Turner was a vice principal and the requested instruction on scope of employment was
inapplicable to her relationship with S&T. Turner and S&T did not submit a substantially correct
instruction. The trial court did not abuse its discretion in refusing the requested instruction. We
overrule appellants' issue on appeal.

 Because we have held the evidence insufficient to support the jury's finding of
intentional infliction of emotional distress and punitive damages, we need not address S&T and
Turner's issues concerning double recovery or other punitive damage questions. 


Conclusion

 We affirm the trial court's judgment as far as it finds S&T and Turner slandered
Ben Bonnington and awards him $35,000 against Turner and $70,000 against S&T. We reverse
and render judgment that Bonnington take nothing against S&T and Turner for intentional
infliction of emotional distress, for punitive damages, and for lost wages. 



 


 Bea Ann Smith, Justice

Before Justices Jones, B. A. Smith and Patterson

Affirmed in Part; Reversed and Rendered in Part

Filed: January 6, 2000

Do Not Publish
1. The testimony is unclear whether Bonnington wrapped one or two ashtrays in his laundry. 
We will refer to only one ashtray.
2. Throwing paper at an employee, frightening her with snake rattles, calling her obscene
names, pilfering and vandalizing her belongings, ostracizing her, and mutilating her photograph
on an employee bulletin board is not extreme and outrageous conduct as a matter of law. See
Horton, 827 S.W.2d at 369-70; see also Humphreys v. Medical Towers, Ltd., 893 F.Supp. 672,
681 (S.D. Tex. 1995), aff'd, 100 F.3d 952 (5th Cir. 1996) (not extreme and outrageous where
defendant encouraged employees to be insubordinate to plaintiff, called plaintiff obscene names,
told her she was incompetent, and treated her with blatant hostility); Saucedo v. Rheem Mfg. Co.,
974 S.W.2d 117, 124-25 (Tex. App.--San Antonio 1998, pet. denied) (supervisor swore at
employee, called him obscene names, threatened to fire him, insulted him in front of others,
blamed him for the supervisor's own mistakes, and harassed employee by paging and calling him
at all hours; held not outrageous and extreme). The few successful cases involve truly extreme
behavior such as unwanted, repeated physical contact, death threats or threats to family members,
or physically menacing and frightening behavior. See, e.g., Bruce, 998 S.W.2d at 613-14
(supervisor lunged and charged at employees, made them believe he would hit them, verbally
threatened and "terrorized" them, swore and made vulgar sexual innuendos, stood uncomfortably
close and screamed and yelled, made them perform menial tasks, and "engaged in a pattern of
grossly abusive, threatening, and degrading conduct" for over two years); Stokes v. Puckett, 972
S.W.2d 921, 924-25 (Tex. App.--Beaumont 1998, pet. denied) (supervisor repeatedly touched
plaintiffs sexually, made repeated sexual remarks and come-ons, swore at plaintiffs in front of
coworkers, stared at plaintiff's breasts); Gonzalez v. Willis, 995 S.W.2d 729, 735-36 (Tex.
App.--San Antonio 1999, no pet.) (graphic sexual advances, sending harassing messages through
coworkers, repeated telephone calls, holding out job assistance in exchange for sexual favors).
3. S&T and Turner cite us to cases discussing the distinction between opinion and factual
assertion. See, e.g., Ollman v. Evans, 750 F.2d 970, 974-75 n.6 (D.C. Cir. 1984);
Yiamouyiannis v. Thompson, 764 S.W.2d 338, 341 (Tex. App.--San Antonio 1988, writ ref'd
n.r.e.); El Paso Times, Inc. v. Kerr, 706 S.W.2d 797, 800 (Tex. App.--El Paso 1986, writ ref'd
n.r.e.). This line of cases relies on Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974), for the
premise that opinion speech is absolutely privileged and uses factors developed in Ollman. 
However, the Milkovich court held that the lower courts have mistakenly relied on Gertz "to
create a wholesale defamation exemption for anything that might be labeled 'opinion,'" thus
developing an unnecessary and artificial distinction between opinion and factual assertions. See
Milkovich, 497 U.S. at 19.
4. S&T and Turner wrongly claim Bonnington "admitted" pilfering from S&T. He did not
admit taking anything from S&T. Bonnington's actual testimony was as follows:


Q: Now, did you ever take anything from S&T anything that belonged to S&T
that was not yours to take?


A: Not unless I took a pen or something like that.



Times Regular"> We affirm the trial court's judgment as far as it finds S&T and Turner slandered
Ben Bonnington and awards him $35,000 against Turner and $70,000 against S&T. We reverse
and render judgment that Bonnington take nothing against S&T and Turner for intentional
infliction of emotional distress, for punitive damages, and for lost wages. 



 


 Bea Ann Smith, Justice

Before Justices Jones, B. A. Smith and Patterson

Affirmed in Part; Reversed and Rendered in Part

Filed: January 6, 2000

Do Not Publish
1. The testimony is unclear whether Bonnington wrapped one or two ashtrays in his laundry. 
We will refer to only one ashtray.
2. Throwing paper at an employee, frightening her with snake rattles, calling her obscene
names, pilfering and vandalizing her belongings, ostracizing her, and mutilating her photograph
on an employee bulletin board is not extreme and outrageous conduct as a matter of law. See
Horton, 827 S.W.2d at 369-70; see also Humphreys v. Medical Towers, Ltd., 893 F.Supp. 672,
681 (S.D. Tex. 1995), aff'd, 100 F.3d 952 (5th Cir. 1996) (not extreme and outrageous where
defendant encouraged employees to be insubordinate to plaintiff, called plaintiff obscene names,
told her she was incompetent, and treated her with blatant hostility); Saucedo v. Rheem Mfg. Co.,
974 S.W.2d 117, 124-25 (Tex. App.--San Antonio 1998, pet. denied) (supervisor swore at
employee, called him obscene names, threatened to fire him, insulted him in front of others,
blamed him for the supervisor's own mistakes, and harassed employee by paging and calling him
at all hours; held not outrageous and extreme). The few successful cases involve truly extreme
behavior such as unwanted, repeated physical contact, death threats or threats to family members,
or physically menacing and frightening behavior. See, e.g., Bruce, 998 S.W.2d at 613-14
(supervisor lunged and charged at employees, made them believe he would hit them, verbally
threatened and "terrorized" them, swore and made vulgar sexual innuendos, stood uncomfortably
close and screamed and yelled, made them perform menial tasks, and "engaged in a pattern of
grossly abusive, threatening, and degrading conduct" for over two years); Stokes v. Puckett, 972
S.W.2d 921, 924-25 (Tex. App.--Beaumont 1998, pet. denied) (supervisor repeatedly touched
plaintiffs sexually, made repeated sexual remarks and come-ons, swore at plaintiffs in front of
coworkers, stared at plaintiff's breasts); Gonzalez v. Willis, 995 S.W.2d 729, 735-36 (Tex.
App.--San Antonio 1999, no pet.) (graphic sexual advances, sending harassing messages through
coworkers, repeated telephone calls, holding out job assistance in exchange for sexual favors).
3. S&T and Turner cite us to cases discussing the distinction between opinion and factual
assertion. See, e.g., Ollman v. Evans, 750 F.2d 970, 974-75 n.6 (D.C. Cir. 1984);
Yiamouyiannis v. Thompson, 764 S.W.2d 338, 341 (Tex. App.--San Antonio 1988, writ ref'd
n.r.e.); El Paso Times, Inc. v. Kerr, 706 S.W.2d 797, 800 (Tex. App.--El Paso 1986, writ ref'd
n.r.e.). This line of cases relies on Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974), for the
premise that opinion speech is absolutely privileged and uses factors developed in Ollman. 
However, the Milkovich court held that the lower courts have mistakenly relied on Gertz "to
create a wholesale defamation exemption for anything that might be labeled 'opinion,'" thus
developing an unnecessary and artificial distinction between opinion and factual assertions. See
Milkovich, 497 U.S. at 19.
4. S&T and Turner wrongly claim Bonnington "admitted" pilfering from S&T. He did not
admit taking anything from S&T. Bonnington's actual testimony was as follows: